UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCELIS ALTAGRACIA VELASQUEZ,

                    Plaintiff,

          -against-

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

                    Defendant.

19cv9303 (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

        In this Social Security action, which is before this Court on consent pursuant to 28 U.S.C.

§ 636(c), plaintiff Arcelis Altagracia Velasquez ("Plaintiff") seeks review of the final decision of

SSA Acting Commissioner Kilolo Kijakazi ("Defendant" or the "Commissioner") (*see supra*,

at n.1), denying Plaintiff Social Security Disability ("SSDI") benefits and Supplemental Security

Income ("SSI") benefits under the Social Security Act (the "Act"), on the ground that, for the

relevant period, Plaintiff's mental impairments and vertigo did not render her disabled under the

Act.  Currently before the Court is Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, for judgment on the pleadings reversing the Commissioner's decision or, in

the alternative, remanding for further proceedings.  (Dkt. 15.)  Also before the Court is

Defendant's cross-motion, made pursuant to Rule 12(c), for judgment on the pleadings affirming

the Commissioner's decision.  (Dkt. 17.)  For the reasons set forth below, Plaintiff's motion

---

        [1] As Kilolo Kijakazi has now been appointed Acting Commissioner of the Social Security
Administration ("SSA"), the Court hereby orders that, pursuant to Rule 25(d) of the Federal
Rules of Civil Procedure, she be substituted for named defendant Andrew A. Saul, who, at the
time the suit was filed, was serving as Commissioner of the SSA.

(Dkt. 15) is granted to the extent it seeks remand for further administrative proceedings, and
Defendant's cross-motion (Dkt. 17) is denied.

## BACKGROUND[2]

Plaintiff filed an application for SSI benefits on May 29, 2018, and a separate application
for SSDI benefits on June 19, 2018, each time alleging a disability onset date of
February 22, 2018, as a result of her mental impairments and vertigo.  (R. at 193-209.)  After her
claims were initially denied on September 12, 2018, Plaintiff requested a hearing before an
administrative law judge ("ALJ").  (*Id.* at 95.)  On March 4, 2019, Plaintiff, represented by
counsel, testified with the assistance of a Spanish interpreter at a hearing held before
ALJ Selwyn S. C. Walters (the "Hearing").  (*Id.* at 33-51.)  At the Hearing, the ALJ also heard
testimony from Yaakov Taitz, a vocational expert ("VE").  (*Id.* at 51-56.)

In a decision issued on May 8, 2019, ALJ Walters found that, although Plaintiff suffered
from the severe impairment of major depressive disorder, along with the non-severe impairment
of vertigo (*id.* at 20-21), her impairments did not meet or equal the criteria of any impairment
listed as disabling in the relevant regulations (*id.* at 21).  The ALJ further found that Plaintiff had
the residual functional capacity ("RFC") to perform medium work with certain non-exertional
limitations, and, therefore, was not disabled under the Act.  (*Id.* at 22-25.)  Plaintiff, represented
by the same counsel, then sought to appeal to the Appeals Council, submitting the reasons why
she disagreed with the ALJ's decision.  (*Id.* at 180-82.)  The Appeals Council denied Plaintiff's
request for review on August 12, 2019, finding that her reasons for seeking review did not

---

[2] The background facts set forth herein are taken from the SSA Administrative Record
(Dkt. 12) (referred to herein as "R." or the "Record").

provide a basis for changing the ALJ's decision.  (*Id.* at 1-8.)  Thereafter, the ALJ's decision

became the final decision of the Commissioner.

Through the same counsel who represented her at the Hearing and on her appeal to the

Appeals Council, Plaintiff now challenges the Commissioner's denial of benefits before this

Court.

### A.      **Plaintiff's Personal and Employment History**

In her applications for SSDI and SSI benefits, Plaintiff stated that she was born on

August 22, 1975, thus making her 42 years old as of her alleged disability onset date of

February 22, 2018.  (*Id.* at 193, 200.)  As to her educational background, Plaintiff reported that

she had graduated from high school in the Dominican Republic and later moved to the United

States in 2005.  (*Id.* at 49, 224.)  Plaintiff reportedly did not attend college or complete any

specialized or vocational training.  (*See id.*)

According to the form "Disability Report" she completed, Plaintiff worked for 15 years –

specifically, from April 2006 to February 2018 – as a "[h]ome attendant" for a health care

system, The New Jewish Home.  (*Id.*)  She reported that she stopped working on

February 22, 2018 due to her conditions of "vertigo, depression, panic disorder, anxiety disorder,

[and her] history of alcoholism."  (*Id.* at 223.)  At the time she completed the form Disability

Report, in June 2018, Plaintiff reported taking the following prescribed medications:  Ativan,[3] Gabapentin (Neurontin),[4] Meclizine,[5] Trazodone,[6] and Venlafaxine (Effexor).[7]  (*Id.* at 225.)

### B.    Medical Evidence

As Plaintiff reported that her disability began on February 22, 2018, the relevant period under review for purposes of her application for SSDI benefits runs from that date until December 31, 2022, the last date when Plaintiff will meet the "insured status" requirements of

---

[3] Ativan (Lorazepam) "is used to treat anxiety disorders.  It is also used for short-term relief of the symptoms of anxiety or anxiety caused by depression.  Lorazepam is a benzodiazepine that works in the brain to relieve symptoms of anxiety.  Benzodiazepines are central nervous system (CNS) depressants, which are medicines that slow down the nervous system."  *Lorazepam (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/lorazepam-oral-route/proper-use/drg-20072296?p=1 (accessed June 24, 2021).

[4] Gabapentin (Neurontin) "works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system."  *Gabapentin (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (accessed June 24, 2021).

[5] "Meclizine is used to prevent and control nausea, vomiting, and dizziness caused by motion sickness.  It is also used for vertigo (dizziness or lightheadedness) caused by ear problems."  *Meclizine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/meclizine-oral-route/description/drg-20075849 (accessed June 24, 2021).

[6] "Trazodone is used to treat depression.  It is thought to work by increasing the activity of serotonin in the brain.  Trazodone is an antidepressant."  *Trazodone (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (accessed June 24, 2021).

[7] Venlafaxine (Effexor) "is used to treat depression.  It is also used to treat general anxiety disorder, social anxiety disorder, and panic disorder.  Venlafaxine belongs to a group of medicines known as serotonin and norepinephrine reuptake inhibitors (SNRI).  These medicines are thought to work by increasing the activity of a chemical called serotonin in the brain." *Venlafaxine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379 (accessed June 24, 2021).

the Act.  *See* 42 U.S.C. §§ 423(a)(1), (c)(1); 20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989).[8]

In contrast, with respect to her application for SSI benefits, the relevant period under review runs from May 29, 2018, the date that Plaintiff applied for those benefits, to May 8, 2019, the date of the ALJ's decision.  *See* 20 C.F.R. §§ 416.330, 416.335; *see Barrie ex rel. F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2560013, at *2 (S.D.N.Y. June 12, 2017) (adopting report and recommendation).[9]

### 1.  Plaintiff's Treatment Records

#### a.  Mental Health Treatment Pre-Dating the Relevant Periods (Morrisania Diagnostic and Treatment Center)

The earliest notes relating to Plaintiff's mental health treatment in the Record date back to May 15, 2017, when she was examined by the psychiatrist Dr. Lorena Grullon-Figeuroa ("Dr. Grullon") of the Morrisania Diagnostic and Treatment Center ("MDTC").  (R. at 448.)  On that date, Plaintiff expressed feelings of depression and anxiety, and explained that she "always [felt] anxious, [had] problems sleeping, and [had] low self-esteem."  (*Id.* at 449.)  Upon a mental

---

[8] To be eligible for SSDI benefits, "an applicant must be 'insured for disability insurance benefits.'"  *Arnone*, 882 F.2d at 37 (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).  "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters." *Id.* (citations omitted).  To qualify for SSDI benefits, "Plaintiff's disability onset date must fall prior to [her] date last insured."  *Camacho v. Astrue*, No. 08-CV-6425, 2010 WL 114539, at *2 (W.D.N.Y. Jan. 7, 2010) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); 20 C.F.R. § 404.315(a).

[9] Generally, "Title II [SSDI] benefits may be paid retroactively for up to 12 months prior to filing of an application.  Payment of Title XVI [SSI] benefits, however, cannot precede the month following the month of application."  *Roman v. Colvin*, No. 13cv7284 (KBF), 2015 WL 4643136, at *1 n.2 (S.D.N.Y. Aug. 4, 2015) (citing 20 C.F.R. §§ 404.621, 416.335); *see also* 20 C.F.R. § 416.501 ("Payment of [SSI] benefits may not be made for any period that *precedes* the first month following the date on which an application is filed . . ." (emphasis added))).

status examination, Dr. Grullon noted that, while Plaintiff exhibited good hygiene, grooming, and eye contact; normal speech, language, and psychomotor activity; a spontaneous, logical, and goal-directed thought process; and fair memory, insight, judgment, and impulse control; she also displayed a labile mood,[10] although without suicidal or homicidal ideation.  (*Id.*)  Based on that examination, Plaintiff was prescribed Venlafaxine (Effexor) and was referred to psychotherapy. (*Id.* at 450.)

At Plaintiff's next appointment with Dr. Grullon on June 12, 2017, it was recorded that Plaintiff "present[ed] [as] much happier and far less depressed," and reportedly felt "much better" and less anxious.  (*Id.* 458 (noting that Plaintiff's sleep and mood reportedly had improved).)  No medication side effects were recorded at that time.  (*Id.* at 459.)  Upon a mental status examination, Dr. Grullon wrote that, in addition to showing normal speech, language, and psychomotor activity; a spontaneous, logical, and goal-directed thought process; and fair memory, insight, judgment, and impulse control; Plaintiff, at that point, displayed a full affect. (*Id.*)  These medical examination findings then remained essentially unchanged for the remainder of the year.  (*See id.* 464-68 (June 26, 2017); 469-71 (Aug. 1, 2017); 472-74 (Aug. 15, 2017); 475-77 (Aug. 22, 2017); 478-79 (Sept. 5, 2017); 480-81 (Sept. 25, 2017); 482-85 (Nov. 2, 2017); 486-87 (Nov. 20, 2017); 488-89 (Dec. 5, 2017); 490-94 (Dec. 19, 2017).)

On January 22, 2018, however, Plaintiff reported to Dr. Grullon that her mood was "sad and lonely," she was experiencing nightmares, she felt anxious about her medications, and she had recently been called "crazy" by her mother.  (*Id.* at 496-97.)  During their next visit on

---

[10] Mood lability, which is "rapid and frequent mood changes that can be disproportionate to current circumstances," is "associated with psychosocial impairment."  UNIVERSITY OF PITTSBURGH, https://psychiatry.pitt.edu/association-between-mindfulness-and-decreased-emotional-lability-young-people-risk-bipolar-disorder (accessed June 26, 2021).

February 6, 2018 (*id.* at 499-501) – which was apparently their last appointment before the periods under review began to run (*i.e.,* before February 22, 2018) – Plaintiff reported to Dr. Grullon that she felt "depressed" and had "been spending a lot of time in bed, except on [her] days off, when she ha[d] to work" (*id.* at 499-500).  Although, at that time, Plaintiff denied having suicidal thoughts, Dr. Grullon, along with a social worker at MDTC, devised a safety plan for Plaintiff should that later change.  (*Id.*)

> **b.** **Mental Health Treatment and Hospitalizations from February 2018 to April 2018 (St. Barnabas Hospital, Bronx-Lebanon Hospital, Lincoln Medical and Mental Health Center, and Jacobi Medical Center)**

On February 14, 2018, Plaintiff was admitted to St. Barnabas Hospital ("St. Barnabas") in the Bronx, New York, after an alcohol-induced suicide attempt.  (*Id.* at 502.)  Although the Record before this Court does not contain hospital records from that admission, Dr. Grullon's treatment notes reflect that, on February 14, Plaintiff had been hospitalized after taking "an unknown quantity of unknown pills along with four beers[,] with the intention of dying."  (*Id.* at 504.)  According to Dr. Grullon, Plaintiff reportedly could not recall the length of her stay or the date of her discharge, but she did inform the doctor that, when "she got home [from St. Barnabas,] her jacket was open," and she was not wearing a blouse.  (*Id.*)

The Record shows that, two days later, on February 16, 2018, Plaintiff was taken to Bronx-Lebanon Hospital ("Bronx-Lebanon"), after her "daughter found her bleeding in bed." (*Id.  See id.* at 387.)  According to that hospital's records, Plaintiff had fallen at home and hit her chest and cut her lip.  (*See id*.)  At Bronx-Lebanon, Plaintiff was diagnosed with an "infected lip wound" and "pleuritic chest pain."[11]  (*Id.* at 389-90.)  Plaintiff's examiner at the hospital noted

_____

[11] "Pleuritic chest pain is characterized by sudden and intense sharp, stabbing, or burning pain in the chest when inhaling and exhaling."  *Pleuritic Chest Pain:  Sorting Through the*

that, although Plaintiff was experiencing chest pain, which worsened when she moved, she did not appear confused, nor was she experiencing dizziness, blurred vision, photophobia (sensitivity to light), nausea, or vomiting.  (*Id.* at 387.)  It appears that Plaintiff was discharged from Bronx-Lebanon the next day, February 17, 2018.  (*Id.* at 390.)

Five days later, on February 22, 2018, Plaintiff called MDTC and spoke with a social worker, Owen Harley, LMSW ("Harley").  (*Id.* at 502.)  During the call, Plaintiff reportedly stated that she was "feeling in a bad way" and that she had "been hospitalized" the week before.  (*Id.*)  Harley recorded that it was "difficult to make out what [Plaintiff] was saying because she was crying," but that Plaintiff denied having "any thoughts of harming or killing herself."  (*Id.*)  Harley scheduled a follow-up appointment with Plaintiff for the following day.  (*See id.*)

On February 23, Plaintiff met with Harley and reportedly stated that she felt "upset" and "preoccupied about not being able to work as a home attendant for a patient who ha[d] not been nice to her."  (*Id.* at 505.)  Upon evaluation, Harley noted that Plaintiff appeared distressed, cried intermittently, and had poor grooming, poor recollection, intermittent eye contact, and "poor to fair" insight and judgment.  (*Id.*)  At the same time, Harley observed that Plaintiff had good hygiene; normal psychomotor activity; a full affect; and a spontaneous, logical, and goal-directed thought process without tangential or circumstantial patterns.  (*Id.*)  Harley wrote that Plaintiff denied having had any hallucinations or delusions, and also denied feeling suicidal.  (*Id.*)  Although Harley determined that Plaintiff was not a danger to herself or others at that time (*see id.*), he noted that he had left a voicemail for Plaintiff's daughter, informing her to call

---

*Differential Diagnosis*, AM. FAM. PHYSICIAN, https://www.aafp.org/afp/2017/0901/p306.html#:~:text=after%20initial%20treatment.-,Pleuritic%20chest%20pain%20is%20characterized%20by%20sudden%20and%20intense%20sharp,to%20the%20neck%20or%20shoulder. (accessed June 30, 2021).

NYC WELL[12] over the next few days or, if necessary, 911, if she felt her mother's life were in danger (*id.* at 505-06).

Three days later, on February 26, 2018, Plaintiff was admitted to Lincoln Medical and Mental Health Center ("Lincoln Medical") in the Bronx.  (*See id.* at 292-99; 305-06; 324-30.) According to the hospital's treatment records, upon arrival, Plaintiff complained that she was "depressed."  (*Id.* at 327.)  On examination, it was recorded that Plaintiff was oriented x3 (*i.e.,* oriented to person, place, and time), was not having hallucinations, and was not agitated.  (*Id.* at 324.)  She was diagnosed with "[m]ajor depressive disorder, single episode, unspecified" and stayed at the hospital overnight.  (*Id.* at 293.)  The next day, February 27, at a meeting with the hospital's addiction counselor, Plaintiff reported that she "had a long history with alcohol use." (*Id.* at 327 (stating "Patient reported she used to drink 18 cans of beer[] 24 oz.").)  Plaintiff was referred to an outpatient substance abuse program and cleared for discharge later that same day. (*Id.* at 328.)

One day later, on February 28, 2018, Plaintiff met with Dr. Grullon at MDTC.  (*Id.* at 513.)  Plaintiff reported that she had been discharged from Lincoln Medical the day before; that she had been given medication, which made her feel "better"; and that she had been encouraged "to go to an alcohol program because the drinking [was] already affecting [her.]"  (*Id.*) Dr. Grullon recorded that Plaintiff reportedly did not have thoughts of hurting herself, felt that she had "good support" from her medical providers, and felt "less anxious and depressed."  (*Id.*) At the same time, however, Plaintiff reported that "her anxiety symptoms [were at their] worst during the night hours," that she felt "sad on and off," and that she experienced "nightmares and

---

[12] NYC Well is a free, confidential mental health support hotline run by the City of New York.  *See* https://nycwell.cityofnewyork.us/en/ (accessed June 30, 2021).

flashbacks related to [her domestic violence] trauma," and she agreed with Dr. Grullon that she "should take a few days off from her job." (*Id.* at 513-14.) On a mental status examination, Plaintiff was found to have good hygiene and grooming; good eye contact; normal speech and language; normal psychomotor activity; a full affect; a spontaneous, logical, and goal-directed thought process; no suicidal ideation; and fair judgment, impulse control, and insight; but she was also found to exhibit a sad and depressed mood. (*Id.* at 514-15.) To treat Plaintiff's "anxiety and depression," Dr. Grullon prescribed Ativan and increased her Effexor prescription. (*Id.* at 514.) With reference to the multiaxial diagnostic technique,[13] Dr. Grullon diagnosed Plaintiff, on Axis I, with major depressive disorder moderate recurrent without psychosis, post-traumatic stress disorder ("PTSD"), and generalized anxiety disorder ("GAD"). (*Id.* at 515.)

On March 9, 2018, Plaintiff spoke with Harley over the phone and reported that she was "doing well, but sometimes fe[lt] stressed" and that she had not been sleeping well because her parents were visiting. (*Id.* at 519.) On March 13, Plaintiff spoke again with Harley, telling him that she wanted to "flee" her home because her parents were arguing. (*Id.* at 522.) On that date, Harley recorded that Plaintiff was "aware that she ha[d] issues with alcohol and [was] open to receiving treatment." (*Id.* at 523.) The next day, March 14, Plaintiff met with Dr. Grullon and

---

[13] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000) ("DSM-IV"), at 27. Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers the individual's Global Assessment of Functioning ("GAF") score. *Id.* The DSM-V, however, does not use this system. *See* Lane, Cheryl, *DSM 5 – Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders,* http://www.psyweb.com/content/main-pages/dsm-5-fifth-edition-of-the-diagnostic-and-statistical-manual-of-mental-disorders/index.jsp (Dec. 1, 2012).

reportedly stated that her parents' arguments over the prior few days had made her anxious and caused her to have nightmares and flashbacks.  (*Id.* at 525 (noting that Plaintiff had trouble sleeping, felt sad "on and off," and had not worked for a few weeks).)  Dr. Grullon again assessed that Plaintiff had major depressive disorder recurrent without psychosis, as well as PTSD and GAD.  (*Id.* at 526-27.)  One week later, on March 21, Dr. Grullon drafted a letter to Plaintiff's employer, stating that Plaintiff had been temporarily disabled, from "2/23/18 to 5/24/18."  (*Id.* at 529.)

On March 23, 2018, Plaintiff met with Harley at MDTC, and, according to Harley's notes, Plaintiff "appear[ed] very distressed, despondent, [and] suicidal."  (*Id.* at 531.)  Harley recorded that Plaintiff reportedly had not eaten for the past five days and had discussed "euthanasia," which Plaintiff "define[d] as someone who 'stops eating in order to die.'"  (*Id.*)  Harley wrote that Plaintiff had been having "distressing nightmares about her ex-husband chasing her and choking her" and had started to "hear[] voices that [told] her to 'finish what [she] started.'"  (*Id.*)  After assessing that Plaintiff was "at risk of hurting herself," Harley called 911, and Plaintiff was taken to Jacobi Medical Center ("Jacobi") in the Bronx, New York.

According to hospital records, at Jacobi:

> [Plaintiff] presented as sad, intermittently tearful[,] and cooperative[.]  She endorsed recent [suicidal ideation], worsening mood, and also reported recent (2/14/18) suicide attempt[.]  She endorsed poor sleep, difficulty concentrating, depressed mood, ruminations[,] and hopelessness.  [She] was admitted to the in-[patient] unit . . . for further observation and treatment.  On evaluation . . . [she] presented as calm, pleasant[,] but with depressed mood and soft speech.  She stated, "I was very anxious [because] I tried to kill myself 4x.[14]  I was hearing voices back in 2013."  When redirected to the present episode, she expressed that she was afraid she would once again become suicidal.

---

[14] A separate treatment note in the Record indicates that Plaintiff had attempted to commit suicide three times in 2013.  (R. at 355.)

(*Id.* at 334-35; *see also id.* at 355 (noting that Plaintiff had intended to "starv[e] herself to death" and that she repeatedly stated she was "not afraid to die").)  Further, at Jacobi, Plaintiff reported that she had been staying home for days without showering, had insomnia, was binge eating, and had recently seen a woman jump in front of a train and thought, "'why don't you just finish it off.'"  (*Id.* at 363.)  On an initial interview, Plaintiff was assessed as having linear thought processes and no signs of thought disorder (*id.*), but as also having "severe[]" depression and an inability "to safely function in the community" (*id.* at 336).  Using the multiaxial diagnostic technique, Dr. Valerie Mildeberger, who evaluated Plaintiff at Jacobi, diagnosed her with depressive disorder NOS (*i.e.,* Not Otherwise Specified) and ETOH (Ethyl alcohol) abuse on Axis I; obesity on Axis III; social stressors and chronic mental illness on Axis IV; and a GAF score of 30[15] on Axis V.  (*Id.* at 337.)  According to Dr. Mildeberger, it was unclear, at the time

---

[15] A GAF score represents a clinician's overall judgment of the patient's level of psychological, social, and occupational functioning.  GAF scores range from 1 to 100, with 1 being the lowest level of functioning and 100 the highest.  *See* DSM-IV, at 34.  A GAF score of 21 to 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (*e.g.,* stays in bed all day; no job, home, or friends)."  *Id.*  A score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  *Id.*  A score of 41-50 indicates "[s]erious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job)."  *Id.*  A GAF score of 51-60 signifies "[m]oderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or coworkers)."  *Id.*  Scores in the 60s and higher indicate symptoms that are "mild," "transient," "minimal," or "absent."  *Id.*  The fifth edition of *Diagnostic and Statistical Manual of Mental Disorders* (the "DSM-V"), however, "has dropped the use of the [GAF] scale," *Restuccia v. Colvin,* No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (S.D.N.Y. Sept. 22, 2014) (quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).  In addition, the SSA has stated that a claimant's GAF score "does not have a direct correlation to the severity requirements in [the SSA's] disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (2000).

of admission, whether Plaintiff was psychotic or if the voices she heard were her own intrusive

thoughts.  (*Id.* at 337-38.)  Plaintiff was hospitalized at Jacobi for 13 days.  (*See id.* at 337-55,

364-65, 555-60.)

In the first few days of her hospitalization, Plaintiff was described as "poorly engaged,"

preoccupied and withdrawn, and "fragile."  (*Id.* at 339.)  More particularly, on March 25, it was

noted that Plaintiff was "at high risk of decompensation," and, on March 27, Dr. Mildeberger

wrote that, while Plaintiff had not had any hallucinations or delusions since her admission, her

"Borderline PD"[16] was "becoming increasingly apparent as [the] predominant theme with [her]

[was] one of feeling abandoned or betrayed by loved ones."  (*Id.* at 339-41.)  Thus, at that time,

Plaintiff remained under "close observation" and her Effexor prescription dosage was increased.

(*Id.* at 342.)  On March 28, Dr. Mildeberger then recorded the following:

> [Plaintiff] noted to have good appetite.  Indicates to be sleeping
> better.  Affect less constricted.  Reluctantly, [Plaintiff] has begun
> to better acknowledge the full extent of her substance abuse.  She
> attempts to justify it by stating her use of alcohol [is] a means of
> self medicat[ion] for [the] depression/anxiety [she is] said to feel.
> However, she also admits [she has] not been compliant with
> medications prescribed for her depression, opting instead to drink.
> Coping skills remain poor and put her potentially at risk[,] were
> she discharged and [were she to] relapse[] with alcohol/drugs.

(*Id.* at 343.)  One day later, on March 29, Dr. Mildeberger observed that Plaintiff had shown

further "improvement" and had been "compliant with medications and off [the] influence of

---

[16] "Borderline Personality Disorder (BPD) is a condition characterized by difficulties
regulating emotion.  This means that people who experience BPD feel emotions intensely and for
extended periods of time, and it is harder for them to return to a stable baseline after an
emotionally triggering event.  This difficulty can lead to impulsivity, poor self-image, stormy
relationships[,] and intense emotional responses to stressors.  Struggling with self-regulation can
also result in dangerous behaviors such as self-harm."  *Borderline Personality Disorder*,
NATIONAL ALLIANCE ON MENTAL ILLNESS, www.nami.org/About-Mental-Illness/Mental-Health-
Conditions/Borderline-Personality-Disorder (accessed June 30, 2021).

alcohol/drugs," but that her coping skills "remain[ed] fragile and [were] deemed to potentially place [her] at risk still outside of [the hospital] setting." (*Id.* at 344-45.) These findings remained largely the same from March 30 to April 3, except that, on March 30, Dr. Mildeberger noted that Plaintiff had become resistant to attending an inpatient rehabilitation program because she believed she was "unable to be far from [her] daughter for long." (*Id.* at 348.)

On April 4, Dr. Mildeberger wrote that, although Plaintiff remained opposed to attending inpatient rehabilitation, she showed a "brighter affect," reported that she had made use of therapeutic groups and activities and socialized more with patients, and voiced an intent to comply with her medications as prescribed and to abstain from alcohol and drugs. (*Id.* at 352.) The doctor reiterated these points on April 5, the day of Plaintiff's discharge. (*Id.* at 354.) According to the hospital's records, at the time of discharge, Plaintiff had been sleeping and eating well, had exhibited a full affect, was compliant with her medications and did not report side effects, was not displaying symptoms of psychosis, no longer reported feeling depressed or anxious, and was willing to attend an outpatient alcohol treatment program. (*See id.* at 354-55, 364-65.)

On April 12, Plaintiff met with Harley at MDTC to discuss outpatient rehabilitation options; Harley recorded that Plaintiff "presented as much calmer and more coherent than the last session" and was well-groomed, made good eye contact, [and showed a thought process that] was rational." (*Id.* at 555.) She was assessed as not being a danger to herself or others. (*Id.*) These findings remained largely unchanged at Plaintiff's next two appointments at MDTC on April 16 and 18. (*See, e.g., id.* at 559-60 (Dr. Grullon's April 16 note that Plaintiff had a full affect; logical thought process; good eye contact; good hygiene; and fair insight, judgment, and impulse control).)

14

On April 30, 2018, Plaintiff was admitted to an outpatient substance abuse treatment program – "Next STEPS" at Montefiore Wellness Center ("Montefiore").  (*Id.* at 633-34.)  Upon admission, Plaintiff reported to Montefiore staff members that, while she was not suffering from any withdrawal symptoms and had been sleeping "well" due to her medications, she suffered from major depressive disorder and anxiety disorder, forgot things "easily," and was aware of the damage caused by her drinking.  (*See id.* at 638-43.)

### c.  Medical Treatment from May 2018 to February 2019

### i.  Continued Mental Health Treatment at MDTC

On May 16, 2018, Plaintiff reported to Dr. Grullon that she was feeling anxious and had "cravings to drink" whenever she saw "something associated with alcohol."  (*Id.* at 566.)  Per Dr. Grullon's notes, Plaintiff appeared motivated; denied feeling hopeless, helpless, or worthless; denied any manic or psychotic symptoms; and denied any suicidal ideation, intention, or plans. (*Id.* at 567.)  On May 22, Plaintiff reported that she was still feeling anxious and depressed.  (*Id.*, at 548.)  Further, while Plaintiff reportedly stated that she had been going to her recovery program, had "been given medication to combat the effects of the cravings of alcohol," and had "stayed away from her friends who dr[a]nk," she also reportedly stated that she "now ha[d] vertigo which could be a secondary effect of drinking."  (*Id.*)  On that same day, MDTC social worker Luz Hernandez ("Hernandez") noted that Plaintiff continued to appear anxious and depressed.  (*Id.*)  On May 30, Plaintiff informed Dr. Grullon that she had recently visited the hospital due to "severe vertigo" and that she had started taking Meclizine to help with the dizziness.  (*Id.* at 570.)  On that date, Plaintiff reported feeling "sad on and off," but indicated that she had been "coping better with her anxiety and depression."  (*Id.* at 571.)  With specific reference to Axis III of the multiaxial diagnostic technique, Dr. Grullon noted that Plaintiff had

pre-diabetes, knee pain, right breast reconstruction, obesity, GERD, high cholesterol, anemia,

and vertigo.  (*Id.* at 572.)  One day later, on May 31, a different doctor at MDTC, Dr. Joseph

Williams, met with Plaintiff and noted that she had a "PHQ-9" score of 24, indicating severe

depressive symptoms.[17]  (*Id.* at 542.)  It was also again recorded that Plaintiff had vertigo.  (*Id.* at

545.)

    Over the next month, Plaintiff met on multiple occasions with Hernandez, Dr. Grullon,

and Harley.  (*See id.* at 540, 579-82, 534-37, 583-85.)  On June 5, Plaintiff reported to Hernandez

that she felt anxious, craved alcohol, and had continued to feel buzzing and ringing in her right

ear.  (*Id.* at 540.)  Plaintiff reported to Dr. Grullon on June 13 that, although there were days

when she felt depressed, her anxiety was improving, she was taking her prescribed medications,

and she was attending a substance abuse program.  (*See id.* at 579-80.)  On evaluation,

Dr. Grullon noted that Plaintiff had a full affect, as well as a logical and goal-directed thought

process.  (*Id.* at 580-81.)  On June 21, Plaintiff reported to Harley that she had "been suffering

from vertigo" and that, as a result, she had not gone to her most recent recovery group meeting.

(*Id.* at 583.)  Then, on June 28, Plaintiff met with Hernandez and, according to Hernandez, she

reported feeling "anxious and depressed due to her medical problems and not being able to get an

extension on her disability benefits" (*id.* at 534); Hernandez noted that Plaintiff was well

groomed, but "did appear anxious and depressed" (*id.*).  One day later, on June 29, in a phone

call with Harley, Plaintiff stated that her "vertigo/dizziness . . . ma[de] it difficult for her to

ambulate."  (*Id.* at 585.)

---

[17] The PHQ-9, or "Personal Health Questionnaire," is a "self-administered . . . depression module," serving as a measure of "depression severity."  Kurt Kroenke *et al.,* *The PHQ-9 Validity of a Brief Depression Severity Measure,* 16 J. GEN. INTERNAL MED. 606 (2001).  PHQ-9 scores of 5, 10, 15, and 20 represent mild, moderate, moderately severe, and severe depression.  *See* http://www.cqaimh.org/pdf/tool_phq9.pdf (last accessed Jul. 20, 2021).

From July to September 2018, Plaintiff continued to meet with Dr. Grullon and Harley at MDTC.  In July, Plaintiff reported feeling anxious and depressed, but Dr. Grullon noted that Plaintiff had good eye contact, good grooming, a full affect, and a logical thought process; Dr. Grullon also noted, at that time, that Plaintiff had reportedly continued to participate in her recovery group.  (*Id.* at 608-09.)  By the end of that month, Dr. Grullon recorded that Plaintiff reportedly felt "much better" in terms of her mental illness, that her recent prescription of Naltrexone[18] had helped her to stay sober, and that, overall, Plaintiff's "anxiety and depression [were] in fair control with her management."  (*Id.* at 612.)  These findings remained largely the same in August and September 2018.  (*See, e.g., id.* at 620-23 (September 19 treatment note that Plaintiff felt "more motivated and less anxious" and that her medication had been helpful and did not have adverse side effects, but that, without the medication, Plaintiff "could not function").)

In early October 2018, Plaintiff reported to Harley that she had "wish[ed that she] could go to sleep and not wake up" (*id.* at 665) and that she had recently fallen in her bathroom and hurt her forehead, shoulder, knee, and right eye (*see id.* at 667).  On October 18, Plaintiff called Harley and stated that she was experiencing headaches and pain in her right eye.  (*Id.* at 670.)  She also reported having been in a recent altercation with her daughter's ex-boyfriend, which made her feel "guilty" and, further, made her not "want to leave [her] house."  (*Id.*)  For the rest of October, she reported feeling "anxious and depressed due to . . . financial problems," but otherwise denied feeling hopeless, helpless, or worthless.  (*Id.* at 674-76 (recording, on

---

[18] Naltrexone (Revia) "is used to help narcotic dependents who have stopped taking narcotics to stay drug-free.  It is also used to help alcoholics stay alcohol-free.  The medicine is not a cure for addiction.  It is used as part of an overall program that may include counseling, attending support group meetings, and other treatment recommended by [a] doctor."  *Naltrexone (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/naltrexone-oral-route/description/drg-20068408 (accessed July 2, 2021).

October 22, that Plaintiff did not display any manic or psychotic symptoms).)  On October 25, Plaintiff informed Harley that she had "not attended her recovery group for over a month," because she was uncomfortable "being around methadone and drug users."  (*Id.* at 680.)

In early November 2018, Harley recorded that Plaintiff was "using a walking stick," that she reportedly could no longer cook "as much anymore because of her dizziness/vertigo," and that she was having "difficulty ambulating."  (*Id.* at 684-86.)  On November 16, Harley noted that, three days earlier, Plaintiff had visited Bronx-Lebanon for her "vertigo/dizziness."  (*Id.* at 687.)  On November 16, Plaintiff was discharged from the Next Steps program at Montefiore. (*Id.* at 633 (discharge summary).)  By the end of November, Dr. Grullon recorded, upon a mental status examination, that Plaintiff had good hygiene and grooming; good eye contact; normal speech and language; normal psychomotor activity; a full affect and no suicidal ideation; a spontaneous, logical, and goal-directed thought process without tangential or circumstantial patterns; no hallucinations or delusions; no internal preoccupation; and fair insight, judgment, and impulse control.  (*Id.* at 689.)

On December 4, 2018, Harley met with Plaintiff and recorded that she was still using a walking stick and that she had reported "feeling bad," feeling "tired of everything," having "no motivation," and having violent thoughts involving her daughter's ex-boyfriend.  (*Id.* at 694-95.)  On December 18, Harley wrote that Plaintiff had reportedly felt dizzy "for about a week," but that she otherwise did not display any "significant changes" in appearance, behavior, mood, affect, speech, or thought process.  (*Id.* at 700.)  On December 31, Plaintiff met with Dr. Grullon and reported that, while she felt "well" during their session, she was generally feeling greater anxiety and depression.  (*Id.* at 703.)  Plaintiff reported to Dr. Grullon that she still had flashbacks and nightmares related to her ex-husband's domestic violence.  (*Id.* at 703-04.)  On a

18

mental status examination, Dr. Grullon's findings remained essentially unchanged from the month before (*see id.* at 705); yet, it was recorded that Plaintiff had reported pain in her knee and legs, which she rated as a "5/10" on the pain scale (*id.*).

In early January 2019, Plaintiff reiterated to Harley that she sometimes wished she could "sleep and not wake up," but that she otherwise did not feel suicidal or have violent thoughts towards herself or others. (*Id.* at 709.) On January 18, Plaintiff spoke to Harley on the phone, telling him that she had "spent about [three] days in bed" and that a neurologist had told her that "her dizziness [was] related to her ears, not her brain." (*Id.* at 712.) One week later, on January 24, Plaintiff reported to Harley that "being alone caus[ed] her to feel 'sad,' yet she [did] not have [the] desire to spend time with people." (*Id.* at 714.) She also was reportedly having reoccurring nightmares. (*Id.*) On January 29, Plaintiff participated in a substance recovery group, during which she stated that she was addicted to food and prone to depressive episodes. (*Id.* at 718-19.)

With respect to Plaintiff's mental health treatment, the last clinical notes in the record dated to February 2019. Specifically, Harley's notes reflect that, on February 5, 2019, Plaintiff told him that she "didn't really like" the recovery group and that her mother had recently told her she was "crazy." (*Id.* at 723.) Two weeks later, on February 18, Plaintiff reportedly told Harley that, although she had not "taken her Naltrexone in 'about [four] months'" and had stopped taking Gabapentin, she was not consuming alcohol, nor did she have "any interest in it." (*Id.* at 728.) Plaintiff reported that she sometimes "forgot" to go to her recovery group meetings, that she would "forget things when no one call[ed her] to remind [her]," and that she had recently "got[ten] lost . . . while going to an appointment." (*Id.* at 729.) In a final note, dated February 27, 2019, Dr. Grullon recorded that Plaintiff's housing issues made her feel

"frustrated," but that she otherwise "fe[lt] stable."  (*Id.* at 732.)  At that time, Plaintiff reported to

Dr. Grullon that she had "stopped taking the Naltrexone and Gabapentin . . . as per her [primary

care physician's] recommendation due to her dizziness."  (*Id* at 732.)  Upon a mental status

examination, Dr. Grullon recorded that Plaintiff had good hygiene and grooming; good eye

contact; normal speech and language; a full affect; no suicidal or homicidal ideation; a

spontaneous, logical, and goal-directed thought process; and fair insight, judgment, and impulse

control.  (*Id.* at 733-34.)  Dr. Grullon also recorded that, at that time, Plaintiff had "a brace [on]

her right leg," had been walking "with difficult[y]," and had described her knee and leg pain as a

"6/10" on the pain scale.  (*Id.*)

### ii.   Dr. Grullon's Medical Source Statement

On October 5, 2018, Dr. Grullon submitted a "Medical Source Statement."  (*Id.* at

624-27.)  In that Statement, Dr. Grullon wrote that she had been treating Plaintiff once a month

for over one year, and that Plaintiff suffered from major depressive disorder without psychosis,

GAD, PTSD, and ETOH abuse.  (*Id.* at 624.)  From the outset, Dr. Grullon noted that Plaintiff

was experiencing the following "psychosocial factors":  flashbacks, reliving abuse, financial

problems, housing issues, a history of domestic violence, and a history of trauma.  (*Id.*)

Dr. Grullon listed Effexor, Trazadone, Naltrexone, and Gabapentin as Plaintiff's medications,

and wrote that these medications caused her to experience dizziness and drowsiness.  (*Id.* at 625.)

As for Plaintiff's "current" symptoms, Dr. Grullon recorded that Plaintiff was

experiencing the following:  poor memory, sleep disturbance, personality change, mood

disturbance, delusions or hallucinations, substance dependence, recurrent panic attacks, paranoia

or inappropriate suspiciousness, feelings of guilt or worthlessness, difficulty thinking or

concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and

generalized persistent anxiety.  (*Id*. at 624.)  Dr. Grullon also noted that Plaintiff was not "able to

be in situations where she [was] yelled at," or where she would "feel threaten[ed] and [would]

isolate."  (*Id.*)  Dr. Grullon indicated that Plaintiff's diagnosis was based on "a complete mental

health status examination," and that Plaintiff's impairments were, in the doctor's view,

"reasonably consistent with the symptoms and functional limitations" described in the Medical

Source Statement.  (*Id.* at 625.)

Turning to Plaintiff's limitations, Dr. Grullon first opined that Plaintiff impairments or

treatment would likely cause her to be absent from work more than three times per month.  (*Id.*)

As to Plaintiff's specific functional abilities, Dr. Grullon opined that Plaintiff had an "extreme

loss" (meaning a "complete loss of ability in the named activity" during an eight-hour workday)

in all of the following areas:

- understanding and remembering very short, simple instructions;

- carrying out very short, simple instructions;

- understanding and remembering detailed instructions;

- carrying out detailed instructions;

- maintaining attention and concentration for extended periods (i.e., two-hour segments);

- sustaining an ordinary routine without special supervision;

- dealing with stress or semi-skilled and skilled work;

- working in coordination with or proximity to others without being unduly distracted;

- making simple work-related decisions;

- completing a normal workday or work week without interruptions from psychologically based symptoms;

21

- performing at a consistent pace without an unreasonable number and length of rest periods;

- interacting appropriately with the public;

- asking simple questions or requesting assistance;

- accepting instructions and responding appropriately to criticism from supervisors;

- getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes;

- maintaining socially appropriate behavior;

- responding appropriately to changes in a routine work setting;

- being aware of normal hazards and taking appropriate precautions;

- traveling to unfamiliar places;

- using public transportation;

- setting realistic goals or making plans independently of others;

- engaging in activities of daily living; and

- maintaining social functioning.

(*Id.* at 626-27.)  In addition, Dr. Grullon opined that Plaintiff had a "marked loss" (meaning a "substantial loss of ability in the named activity" or an ability to sustain performance "only up to 1/3 of an [eight]-hour workday") in the following areas:

- remembering locations and work-like procedures;

- maintaining regular attendance and being punctual; and

- adhering to basic standards of neatness and cleanliness.

(*Id.* at 626.)

According to Dr. Grullon, Plaintiff also had a "constant" limitation in her ability to

maintain concentration, persistence, or pace, "resulting in [a] failure to complete tasks in a timely

manner." (*Id.* at 627.) Lastly, Dr. Grullon opined that, while Plaintiff could manage benefits in

her own interest, she was "continual[ly]" subject to "[e]pisodes of deterioration or

decompensation in work or work-like settings[,] which [would] cause [her] to withdraw from

that situation or to experience exacerbation of signs and symptoms." (*Id.*)

### iii.    Treatment for Vertigo from May 2018 to January 2019

As noted above, while Plaintiff's mental health treatment at MDTC was ongoing, she

also was seen by various doctors to treat her symptoms of vertigo.[19]

In this regard, the Record reflects that, on May 17, 2018, Plaintiff visited

Bronx-Lebanon because she had reportedly experienced dizziness, nausea, and "vomiting for

[the prior] 12 hours." (*Id.* at 384.) Upon an initial interview, Dr. Steven Gottesfeld noted that

Plaintiff had "peripheral vertigo" and had been "reluctant" to participate in the "EOM"

(extraocular muscle function) exam because it was "causing vertigo." (*Id.* at 384-85.) During a

---

[19] Although not discussed by either party or the ALJ, the Record contains two treatment notes from Lincoln Medical – dated December 4, 2017 and January 2, 2018 – indicating that Plaintiff had visited the hospital on each of those days because she felt dizzy. (R. at 308, 311.) On December 4, 2017, Plaintiff described her dizziness "as a whooshing noise in [her] ears followed by vertigo where she [felt] as if she [was] in a tornado." (*Id.* at 311.) She reported then that the vertigo was lasting up to seven minutes at a time. (*Id.*) Based on these reported symptoms, Plaintiff was assessed with having "vertigo attacks consistent with [M]eniere's [Disease] [*i.e.,* a disorder of the inner ear that can lead to dizzy spells] with confound of possible anxiety attacks and depression." (*Id.* at 312.) Then, on January 2, 2018, Plaintiff returned to Lincoln Medical, complaining of dizziness, headaches, vomiting, and upper abdominal pain. (*Id.* at 308.) At that time, she was assessed as being in "mild/moderate distress." (*Id.*)

"re-check" three hours later, Dr. Gottsfeld recorded that Plaintiff appeared "stable" and was "improving with treatment." (*Id.* at 385.) At the time of Plaintiff's discharge later that same day, Dr. Gottsfeld wrote that the results of Plaintiff's scans and labs were "unremarkable," and her neurological condition was "intact." (*Id.*)

On November 13, 2018, Plaintiff returned to Bronx-Lebanon to receive further treatment for her vertigo and dizziness. (*Id.* at 687.) Although the Record before the Court does not contain that hospital's records, Harley's notes from MDTC indicate that, at that time, Plaintiff reported to her treaters that she was having trouble ambulating due to the vertigo. (*Id.* at 686.)

Lastly, the Record shows that, on January 18, 2019, Plaintiff was evaluated by a neurologist, who, upon reportedly informing her that her dizziness was related to her ears, referred her to an ear, nose, and throat specialist. (*Id.* at 712.)

### 2. Consultant Reports

#### a. Psychological Consultative Examiner (Dr. Jeanne Villani, Psychologist)

On July 21, 2018, at the request of the SSA, Plaintiff visited a psychologist, Dr. Jeanne Villani, for a consultative psychiatric evaluation, which was performed with the help of an interpreter. (*Id.* at 592-95.) Dr. Villani recorded that Plaintiff had taken public transportation to the evaluation and had been accompanied by a friend. (*Id.* at 592.) Describing Plaintiff's psychiatric history, Dr. Villani wrote that she had been hospitalized several times in 2018, due to a suicide attempt and to treat her depression and alcohol abuse. (*Id.*)

As for Plaintiff's level of "current functioning," Dr. Villani recorded the following, based on Plaintiff's account:

> Frequent waking and increased appetite. She has gained about
> 20-30 pounds in the last [six] months. She wakes about 3-4 times
> without medication. The medication helps. She describes
> dysphoric mood, crying spells, guilt, hopelessness, concentration

> difficulties, diminished sense of pleasure[,] and social withdrawal
> related to depression.  A suicide risk assessment was submitted.
> She hears a voice periodically.  It is related sometimes to drug and
> alcohol interaction, saying she should kill herself, [and] to hurt
> herself in some way.  She is being treated at [MDTC].  She talks
> about the trauma that she experienced in 2013, domestic violence
> which creates nightmares and makes her very anxious.  She is
> compliant with her medications to help calm herself.  She is
> currently in an alcohol treatment program.  No homicidal ideation
> reported.  Anxiety:  Excessive apprehension and worry, irritability,
> phobic response to heights and at night because of the domestic
> violence [incident]. . . Panic attacks:  Nothing reported.  No manic
> symptomology reported and at times there is a voice that tells her
> to hurt herself.  No other symptoms reported.  Short term memory
> deficits, receptive language deficits, and difficulty learning new
> material reported.

(*Id.* at 592-93.)

Upon a mental status examination, Dr. Villani found that Plaintiff was cooperative and related adequately, had a "casual mode" of dress and was fairly groomed, had appropriate eye contact, and had normal motor behavior and posture.  (*Id.* at 593.)  Dr. Villani described Plaintiff's affect as "dysphoric," and her mood as "dysthymic"[20] and "sad."  (*Id.*)  As to Plaintiff's thought content, Dr. Villani found that, while Plaintiff was oriented x3, her attention and concentration were "[m]ildly impaired," as Plaintiff could count to 10 and do simple calculations but had difficulty with serial sevens as well as serial threes.  (*Id.*)  Dr. Villani also found that Plaintiff's recent and remote memory skills were "[m]ildly impaired," as she could only recall 2/3 of objects immediately and after a delay, with "digits forward up to [four], [but]

---

[20]  Dysthymic Disorder is defined as "a chronically depressed mood that occurs for most of the day, more days than not, for at least [two] years," with "symptom-free intervals last[ing] no longer than [two] months," accompanied by at least two additional symptoms including "poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness."  *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") at 377 (4th ed., text revision 2000).

no digits backwards." (*Id.*) Dr. Villani stated that Plaintiff's insight and judgment were "fair,"

but characterized her cognitive functioning as "below average." (*Id.* at 594.)

Regarding Plaintiff's mode of living, Dr. Villani recorded that Plaintiff was able to dress,

bathe, and groom herself, but that she had "some difficulty" completing those tasks because she

would become "dizzy" due to the vertigo. (*Id.* (also noting that Plaintiff had "difficulty being in

close spaces").) She noted that Plaintiff used the microwave, but did not otherwise cook, clean,

do laundry, shop, manage money, or drive. (*Id.*) Further, while Dr. Villani noted that Plaintiff

reportedly had a fear of "falling," left "a lot of things unattended to," and generally did not leave

the house, she did have some friends to "socialize[] with," in addition to her daughter. (*Id.*)

Dr. Villani went on to note that the "[r]esults of her examination appear[ed] to be consistent with

psychiatric and substance abuse problems[,] but, in itself, this [did] not appear to be significant

enough to interfere with [Plaintiff's] ability to function on a daily basis." (*Id.*) Overall,

Dr. Villani assessed Plaintiff with having unspecified depressive disorder, panic disorder, GAD,

substance abuse disorder (alcohol), and vertigo. (*Id.*)

In the portion of her report titled "Medical Source Statement," Dr. Villani opined that

there was "[n]o evidence" that Plaintiff had "limitations in interacting adequately with

supervisors, coworkers and the public, sustaining an ordinary routine and regular attendance at

work, [or having] an awareness of normal hazards and taking adequate precautions." (*Id.*)

Dr. Villani opined that Plaintiff had "mild limitations in understanding, remembering, or

applying simple and complex directions or instructions, using reason and judgment to make

work-related decisions, sustaining concentration and performing a task at a consistent pace,

regulating emotions, controlling behavior, [] maintaining well-being, and maintaining personal

hygiene and appropriate attire due to emotional distress." (*Id.*) After concluding that Plaintiff's

overall prognosis was "fair," Dr. Villani recommended that Plaintiff continue her psychological, psychiatric, and "alcohol treatment" for at least the next year.  (*Id.* at 594-95.)

### b.  Internal Medicine Consultative Examiner (Dr. Sharon Revan, Rheumatologist)

On the same day as she visited Dr. Villani (July 21, 2018), Plaintiff also met with Dr. Sharon Revan, a rheumatologist, for an internal medicine consultative examination.  (*See id.* at 587-89.)  Dr. Revan noted that Plaintiff reported having a history of depression, anxiety, insomnia, panic attacks, and alcoholism.  (*Id.* at 587.)  Dr. Revan also noted that Plaintiff reported having had vertigo, but that no cause had been found.  (*Id.*)  She recorded that Plaintiff's vertigo reportedly occurred "four times a day," and that it lasted "about five to [10] minutes" each time.  (*Id.*)  After noting that physical therapy reportedly had not helped, Dr. Revan wrote that an MRI had shown "there [was] something in [Plaintiff's] ear that [was] twisted that l[ed] to her dizziness," but "[e]very time [doctors] tr[ied] to go into her ear to fix it[,] she vomit[ed]." (*Id.*)  Dr. Revan also wrote that Plaintiff had been an "alcoholic for the last four to five years." (*Id.*)

As for Plaintiff's mobility, Dr. Revan recorded that Plaintiff was able to sit, stand, lie down, and climb stairs without complaints, and could reportedly walk three to four blocks without issue.  (*Id.*)  Regarding activities of daily living, Dr. Revan noted that, while Plaintiff could shower and dress herself, she reportedly needed her daughter's help to put on her shoes and socks, cook, clean, do laundry, and shop.  (*Id.* at 587-88.)

Upon a physical examination, Dr. Revan recorded that Plaintiff did not appear to be in acute distress; had a normal gait; was able to walk on her heels, but not her toes; had a normal stance without the use of an assistive device; and was able to get on and off the exam table, as well as rise from a chair, without difficulty.  (*Id.* at 588.)  Dr. Revan assessed Plaintiff as having

depression, vertigo, anxiety, insomnia, panic attacks, and alcoholism.  (*Id.* at 589.)  In the portion

of her report titled "Medical Source Statement," Dr. Revan opined that Plaintiff had a "[m]ild

limitation" with personal grooming due to back pain, and a "[l]imitation with activities of daily

living due to vertigo," and she otherwise assessed Plaintiff's prognosis as "[f]air."  (*Id.*)

c.  <u>**SSA Records Examiner**</u>
<u>**(Dr. L Haus, Psychologist)**</u>

Approximately one month after Plaintiff was evaluated by Drs. Villani and Revan, the

SSA requested an opinion from the psychologist Dr. L. Haus, who, on August 23, 2018,

reviewed the then-available evidence.  (*See id.* at 57-84.)  Dr. Haus noted that Plaintiff had three

"severe" medically-determinable impairments falling under the categories of:  (1) "Depressive,

Bipolar and Related Disorders," (2) "Vestibular System Disorders,"[21] and (3) "Anxiety and

Obsessive-Compulsive Disorders."  (*Id.* at 76-77.)  As to Plaintiff's functional limitations,

Dr. Haus opined that Plaintiff was "not significantly limited" in her abilities to remember

locations and work-like procedures; to understand and remember very short and simple

instructions; and to understand and remember detailed instructions.  (*Id.* at 81.)

As for Plaintiff's "sustained concentration and persistence limitations," Dr. Haus opined

that Plaintiff had "moderate" limitations in the following:

> her ability to perform activities within a schedule, maintain regular
> attendance, and be punctual within customary tolerances; to work
> in coordination with or in proximity to others without being
> distracted by them; and to complete a normal workday and
> workweek without interruptions from psychologically-based

---

[21]  The vestibular system includes the parts of the inner ear and brain that process the
sensory information involved with controlling balance and eye movements.  *See generally
Vestibular Balance Disorder*, JOHNS HOPKINS MEDICINE,
https://www.hopkinsmedicine.org/health/conditions-and-diseases/vestibular-balance-disorder
(accessed July 2, 2021).

> symptoms and to perform at a consistent pace without an
> unreasonable number and length of rest periods.

(*Id.*)  At the same time, however, Dr. Haus opined that Plaintiff was "not significantly limited" in her abilities to carry out very short and simple instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, and to make simple work-related decisions.  (*Id.*)

Next, as to Plaintiff's "social interaction limitations," Dr. Haus opined that Plaintiff had "moderate" limitations in her ability to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors.  (*Id.* at 81-82.)  On the other hand, Dr. Haus opined that Plaintiff was "not significantly limited" in her abilities to ask simple questions or request assistance; to get along with coworkers or peers without distracting them or exhibiting behavior extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id.*)

Finally, with regard to Plaintiff's "adaptation limitations," Dr. Haus opined that Plaintiff had "moderate" limitations in her abilities to respond appropriately to changes in the work setting; to travel to unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (*Id.* at 82.)  Yet, Dr. Haus also opined that Plaintiff was "not significantly limited" in her ability to be aware of normal hazards and take appropriate precautions.  (*Id. See id.* at 80 (separately noting that Plaintiff should avoid hazards such as machinery and heights due to her history of vertigo).)

Overall, Dr. Haus opined that (1) Plaintiff's conditions did not meet the criteria of the Listings 12.04 (Depressive, Bipolar, and Related Disorders) or 12.06 (Anxiety and Obsessive-Compulsive Disorders) (*id.* at 77); (2) Plaintiff's "statements regarding [her] symptoms," were only "[p]artially consistent" with "the total medical and non-medical evidence

in [the] file" (*id.* at 78); and (3) Plaintiff, ultimately, was "not disabled" because she was "able to sustain unskilled work with hazards limits" (*id.* at 69-70, 82).

C.    **Plaintiff's Subjective Complaints**

1.    **Plaintiff's Function Report**

In July 2018, Plaintiff completed a form "Function Report" in connection with her claims for benefits.  (*Id.* at 233-39.)  In that report, Plaintiff wrote, with the help of an interpreter, that she had been attending a rehabilitation program for one hour, three days a week, but for "[t]he rest of the time, [she was] mostly in bed due to vertigo and [her] fear of being alone in the street."  (*Id.* at 232.)  In addition to noting that her conditions caused her to have nightmares, insomnia, and feel panicked (*id.* at 233), Plaintiff reported that she had trouble putting her shoes on due to her vertigo and dizziness; she had trouble bathing when she was depressed or when she closed her eyes (again, because of the vertigo); she could not "do her hair by [herself] so [her] daughter" had to help her; she generally felt dizzy, even when she was sitting down, and that she needed to rise slowly, while holding onto "something stable as a support"; and her "eyesight and stomach ha[d] become more sensitive after the vertigo," causing her to experience increased nausea (*id.* at 233-34).

Next, Plaintiff reported that her daughter, then 20 years old, needed to remind her to take care of her personal needs and oversaw her medication regimen, and that she (Plaintiff) sometimes forgot to turn the stove off while cooking.  (*Id.* at 234.)  Plaintiff reported that, when she was "depressed, [she would] just stay in bed and [would] not [eat] for [two] days."  (*Id.* (but noting, at the same time, that she still took her medications even when she did not eat).)  While she wrote that she did not go shopping or clean the house anymore, Plaintiff did indicate that she was able to fold clothes and use the washing machine.  (*Id.* at 235-36.)

Plaintiff recorded that she generally did not leave her home, due to her dizziness, and that she only went outside to go to church once a week (*id.* at 236) or to her rehab appointments three times a week (*id.*).  Plaintiff explained that, to get to her appointments, she either took a taxi or used public transportation, and that, in general, she was "terrified to go out at nighttime [or in the] dark," and, when she did go out alone, it was "with fear" (*id.* at 235).  As for hobbies, she reported that she watched television each day, sewed once a month, and read about 10 minutes each day.  (*Id.* at 236.)  In describing how her conditions had affected her activities of daily living, Plaintiff noted that her "tolerance for noise and people ha[d] decreased," and that her right ear had become "very sensitive" to loud noises.  (*Id.*)  She further reported that, when she was alone, she could only walk for about two blocks, but, when she was accompanied, she could walk about 10 blocks before stopping.  (*Id.* at 238.)  Although she indicated that she could follow spoken and written instructions and did not have problems with people in positions of authority (*id.* at 238-39), she explained that she had trouble remembering things, felt distressed when she went outside of her home, and became "nervous and tense and [would] lose [her] ability to concentrate" (*id.* at 239).

Lastly, Plaintiff indicated that her anxiety began in 2013 after her ex-husband had choked her, and that it had worsened in or around January 2018.  (*Id.* at 239 (recording that the anxiety caused nightmares).)  She wrote that memories of that incident, as well "being in enclosed places [and] hearing people arguing," were "triggers" that caused her to experience panic attacks.  (*Id.* (writing that it took her between two and three hours "to calm down after being exposed to a trigger").)  Plaintiff reported that her anxiety made her "have trouble trusting others."  (*Id.*)

#### 2.    Plaintiff's Testimony before the ALJ

As noted above, Plaintiff appeared with counsel and testified with the assistance of a Spanish interpreter at the March 4, 2019 Hearing.  (*See id.* at 33.)  When asked about how she had traveled to the Hearing, Plaintiff testified that she took the bus, but had been accompanied by a friend because she tended to "forget[] things" and would sometimes "get lost."  (*Id.* at 40.)  Consistent with her Function Report, Plaintiff described to the ALJ that she had been the victim of domestic violence in 2013 and that she had continued to feel anxiety after that incident, which, in particular, meant that she experienced nightmares, had trouble sleeping (even with medication), and sometimes felt like she was "lacking air."  (*Id.* at 42-43.)  She also testified that she experienced auditory hallucinations.  (*Id.* at 46.)

When asked about her vertigo diagnosis, Plaintiff testified that her symptoms of vertigo included "vomiting, dizziness," and loss of balance; she also reported "fall[ing] a lot" and that it felt as if something were in her ears.  (*Id.* at 48.)  She stated that, on average, she experienced dizzy spells three times per week, and, as a result of her vertigo, she could not go on the train, she did not "go up heights," and she felt dizzy when she sat down on the bus.  (*Id.*)  After further questioning from her counsel, Plaintiff testified that, while she attended church each week, she "almost always" had trouble getting out of bed; she sometimes missed appointments because she could not get out of bed; and she did not cook, clean, or shop.  (*Id.* at 50.)

#### D.    The VE's Testimony Before the ALJ

VE Taitz testified at the end of the Hearing.  (*Id.* at 51-56.)  The VE first explained that Plaintiff's past work as a home attendant qualified as "medium" exertional work at Specific Vocational Preparation ("SVP") 3 – meaning that it was a "semi-skilled" job.  (*Id.* at 52.)  The ALJ then asked the VE whether there were jobs available for a hypothetical person of Plaintiff's

age, education, and work experience, with the RFC to engage in a full range of medium work as defined in the Dictionary of Occupational Titles ("DOT"), but with the following limitations: the person would be limited to understanding, retaining, and following simple instructions and sustaining sufficient attention to perform simple repetitive tasks by routine, while, at the same time, the person would be able to maintain the ability to respond appropriately to usual work situations and deal with changes in a routine work setting. (*Id.*)

Considering these limitations, the VE first noted that such a hypothetical person could not perform Plaintiff's past work because it was considered "semi-skilled." (*Id.*) Nevertheless, the VE testified that such a hypothetical person could perform certain unskilled jobs (all at a medium exertion level of SVP 2) existing in the national economy, including the jobs of office cleaner, dining room attendant, and kitchen helper. (*Id.* at 52, 53.) The VE went on to state that the hypothetical person could perform the same three jobs, even if there were an additional limitation that there be "no strict production-paced or assembly line quotas." (*Id.* at 53.) The VE noted, however, that, if the same hypothetical person were further limited to the extent that she could only have "occasional interaction with coworkers, supervisors, and the public," then the job of "kitchen helper" would need to be substituted for "hand packager," as the former might require more than "occasional contact" with coworkers. (*Id.* at 53-54.)

Finally, in response to questioning from Plaintiff's counsel, the VE testified that none of the above-mentioned representative jobs could be performed by a person who would be off task for 10 percent or more of the day or absent for more than one day per month. (*Id.* at 54-55 (VE also noting that, if the individual were "a half hour tardy" once every two weeks, that "could still be okay," but if it was "more than that it may not be").)

### E.    **The Current Action and the Motions Before the Court**

Represented by counsel, Plaintiff filed a Complaint in this action on October 8, 2019

challenging the decision of the Commissioner, denying her SSDI and SSI benefits.  (*See*

Complaint, dated Oct. 8, 2019 ("Compl.") (Dkt. 1).)  Plaintiff maintained in her Complaint that

she was entitled to receive SSDI and SSI benefits because of her impairments (*id.* ¶¶ 4, 9),

claiming that the ALJ's decision, as affirmed by the Appeals Council, was "erroneous, not

supported by substantial evidence on the record, and/or contrary to the law" (*id.*).

On June 1, 2020, Plaintiff filed a motion for judgment on the pleadings in her favor

(Dkt. 15), essentially advancing two arguments.  First, while apparently recognizing that, in light

of a change in the relevant SSA regulations (*see* Discussion, *infra*, at Section I(C)), the so-called

"treating physician rule" was not applicable to her claims for benefits, Plaintiff contends that the

ALJ nonetheless committed legal error by failing to evaluate the medical opinion evidence

properly, in accordance with the new regulations.  In particular, Plaintiff argues that the ALJ

failed, under the applicable law, to give appropriate consideration to the Medical Source

Statement of Plaintiff's long-time treating psychiatrist, Dr. Grullon, who had found Plaintiff to

have a significant number of "extreme" or "marked" limitations (*see* Pl. Mem., at 20-24), and

that the ALJ had an insufficient basis for finding persuasive the opinion of the consultative

examiner, Dr. Villiani, especially as, according to Plaintiff, Dr. Villani's opinion was

"inconsistent with her own examination findings" (*id.*, at 24-25).  Second, Plaintiff contends that

the ALJ's RFC determination was not supported by substantial evidence because it failed to

account for any of the functional limitations that resulted from Plaintiff's vertigo diagnosis, or

from her diagnoses of GAD and PTSD.  (*Id.* at 26-27.)

On July 31, 2020, Defendant filed a cross-motion for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 17.)  In opposition to Plaintiff's motion and in support of the cross-motion, Defendant contends that the underlying decision of the ALJ was legally correct and supported by substantial evidence.  Specifically, Defendant argues that the ALJ's decision, including his RFC determination, properly (1) weighed the medical opinion evidence, (2) evaluated the treatment notes in the Record, and (3) accounted for the limitations assessed by Dr. Villani and Dr. Haus.  (*See* Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of [Defendant's] Cross-Motion for Judgment on the Pleadings, dated July 31, 2020 ("Def. Mem.") (Dkt. 18), at 11-14.)

Plaintiff has not filed a reply brief.

## DISCUSSION

### I.  APPLICABLE LEGAL STANDARDS

#### A.  Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, *Vt.*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied, and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition

of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

B.     **The Five-Step Sequential Evaluation**

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c); *id.* §§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id*. §§ 404.1520(d), 416.920(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. §§ 404.1520a and 416.920a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment

satisfies Social Security regulations at Step Three.[22]  *See Kohler v. Astrue*, 546 F.3d 260, 265

(2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment,"

the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the

presence of the impairment(s)," then "rate the degree of functional limitation resulting from the

impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a]," which

specifies four broad functional areas:  (1) activities of daily living; (2) social functioning;

(3) concentration, persistence or pace; and (4) episodes of decompensation.[23]  20 C.F.R.

§§ 404.1520a(b), (c)(3); *id.* §§ 416.920a(b), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional

limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate,

marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated

on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R.

§§ 404.1520a(c)(4), 416.920a(c)(4).

     If the claimant's impairment does not meet or equal a listed impairment, then the ALJ

must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to

perform physical and mental work activities on a sustained basis.  *Id.* §§ 404.1545, 416.945.  The

ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether

---

[22] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to evaluate claims involving mental disorders under Titles II and XVI of the Act, effective January 17, 2017.  These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and 416; *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

[23] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.*

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her

past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's

RFC, age, education, and work experience, the claimant is capable of performing "any other

work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g); *id.* §§ 416.920(a)(4)(v),

(g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden

of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (internal citation

omitted).  At the fifth step, the burden shifts to the Commissioner to "show that there is work in

the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir.

2009).  The Commissioner must establish that the alternative work "exists in significant

numbers" in the national economy and that the claimant can perform this work, given his or her

RFC and vocational factors.  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can

satisfy this burden by referring to the Medical-Vocational Guidelines (the "Grids"), set out in

20 C.F.R. Pt. 404, Subpt. P, App. 2.  Where, however, the claimant suffers non-exertional

impairments, such as psychiatric impairments, that "'significantly limit the range of work

permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational

expert," rather than rely exclusively on these published guidelines. *Zabala v. Astrue*, 595 F.3d

402, 410 (2d Cir. 2010) (quoting *Bapp*, 802 F.2d at 605-06).

### C.    <u>Evaluation of Medical Opinion Evidence</u>

For SSI and SSDI applications filed prior to March 27, 2017, SSA regulations dictated

that an ALJ was to give more weight to the opinions of those physicians with the most

significant clinical relationship with the plaintiff.  *See* 20 C.F.R. §§ 404.1527, 416.1527; *see also, e.g.*, *Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (Summary Order).  Under this "treating physician rule," an ALJ was required to "give good reasons" if he or she determined that a treating physician's opinion was not entitled to "controlling weight," or, at least, "more weight" than the opinions of non-treating and non-examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  Further, under that same rule, a consultative physician's opinion was generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (Summary Order).

On January 18, 2017, however, the SSA published comprehensive revisions to its regulations regarding the evaluation of medical evidence, applicable to benefits applications filed on or after March 27, 2017 (such as Plaintiff's benefits claims in this case).  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (available at 2017 WL 168819).  In implementing new regulations, the SSA has apparently sought to move away from a perceived hierarchy of medical sources.  *See* 82 Fed. Reg. 5844.  Thus, the new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),[24] including those from [a claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a),

---

[24] Under the new regulations, a "prior administrative medical finding" is defined as:

> a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (*see* § 404.900) in your current claim based on their review of the evidence in your case record, such as:  (i) The existence and severity of your impairment(s); (ii) The existence and severity of your symptoms; (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; (iv) Your residual functional

416.1520c(a).  Instead, an ALJ is to consider all medical opinions in the record and "evaluate

their persuasiveness" based on the following five "factors":  (1) supportability, (2) consistency,

(3) relationship with the claimant, (4) specialization, and (5) any "other" factor that "tend[s] to

support or contradict a medical opinion."  *Id.* §§ 404.1520c(a)-(c), 416.920c(a)-(c).  Despite the

requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each

factor varies.  *Id.* §§ 404.1520c(a)-(b), 416.1520c(a)-(b).

More specifically, under the new regulations, the ALJ must "explain," in all cases, "how

[he or she] considered" both the supportability and consistency factors, as they are "the most

important factors."  *Id.* §§ 404.1520c(b)(2), 416.1520c(b)(2); *see Amber H. v. Saul*,

No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (noting that the

two "most important factors for determining the persuasiveness of medical opinions are

consistency and supportability," which are the "same factors" that formed the foundation of the

treating physician rule).  For supportability, "the strength of the medical opinion increases as the

relevance of the objective medical evidence and explanations presented by the medical source

increase."  *Vellone v. Saul*, No. 20cv261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan.

29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)).  Consistency, on the other hand,

"is an all-encompassing inquiry focused on how well a medical source is supported, or not

supported, by the entire record."  *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)); *see*

---

> capacity; (v) Whether your impairment(s) meets the duration
> requirement; and (vi) How failure to follow prescribed treatment
> (*see* § 404.1530) and drug addiction and alcoholism (*see*
> § 404.1535) relate to your claim.

20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5).

*generally* 42 U.S.C. § 423(d)(5)(B) (governing SSA statute that requires an ALJ to base the decision on "all the evidence available in the [record]").

In addition, under the new regulations, *see* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2), the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (*i.e.,* relationship with the claimant, specialization, and "other") in determining the persuasiveness of a medical source's opinion.  Where, however, the ALJ has found two or more medical opinions to be equally supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those three remaining factors.  *See id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

Although, at this time, there appear to be only a handful of opinions at the district level within the Second Circuit that have considered the application of the new regulations, those courts that have been "presented with these [new] regulations have concluded that the factors are very similar to the analysis under the old [treating physician] rule."  *Dany Z. v. Saul*, No. 2:19-CV-217, 2021 WL 1232641, at *11 (D. Vt. Mar. 31, 2021) (citing *Cuevas v. Comm'r of Soc. Sec.*, No. 20cv0502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (surveying Second Circuit district court level cases considering the new regulations and concluding that they show that "the essence" of the treating physician rule "remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar")).  As another court in this District recently explained, "[t]his is not surprising[,] considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not inconsistent* with the rest of the record before controlling weight could be assigned."  *Cuevas*, 2021 WL 363682, at *9 (emphasis in original); *see also Andrew G. v. Comm'r of Soc. Sec.*, No.

3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (noting that

"consistency and supportability" were "the foundation of the treating source rule"); *see, e.g.,*

*Brianne S. v. Comm'r of Soc. Sec.*, No. 19-cv-1718-FPG, 2021 WL 856909, at *5 (W.D.N.Y.

Mar. 8, 2021) (remanding to the ALJ with instructions to provide an explicit discussion of the

supportability and consistency of two medical opinions and explaining that an ALJ may not

merely state that an examining physician's opinion is not consistent with the overall medical

evidence).[25]

### D.   Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect

of those symptoms on the claimant's ability to work involves a two-step process.  Where a

claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required,

first, to determine whether the claimant suffers from a "medically determinable impairment[ ]

that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R.

§§ 404.1529(c)(1), 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ

must take the second step of "evaluat[ing] the intensity and persistence of [the claimant's]

---

[25] Although it is not yet clear how much the new regulations regarding the weighing of medical opinion evidence may affect other aspects of the body of Second Circuit law that has developed with respect to Social Security appeals, this Court joins other courts in this District in concluding that other, longstanding general principles of judicial review still apply to cases with benefits claims that were filed on or after March 27, 2017.  *See, e.g., Cuevas*, 2021 WL 363682, at *15 (determining that the well-settled principle in this Circuit that an ALJ "cannot ignore or mischaracterize evidence" applied "equally to the ALJ's mandatory explanation of the new consistency factor," and, thus, holding that the ALJ committed legal error by failing to satisfy that principle).  Certainly, nothing in the new regulations should obviate the ALJ's obligation to develop the Record, *see, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted), to consider "all of the relevant medical and other evidence," 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3), and to refrain from substituting his or her own lay opinion for that of medical professionals, *see, e.g., Merriman v. Comm'r of Soc. Sec.*, No. 14cv3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015) (*adopting report and recommendation*).

symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work." *Id.* §§ 404.1529(c)(1), 416.929(c)(1).  In doing so, the ALJ must consider all of the available evidence, and must not "reject [] statements about the intensity and persistence" of the claimant's symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements." *Id.* §§ 404.1529(c)(2), 416.929(c)(2).  Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's statements in relation to the objective evidence and other evidence, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities. *Id.* §§ 404.1529(c)(3)-(4); *id.* §§ 416.929(c)(3)-(4); *see also* SSR 16-3p.[26]

While an ALJ is required to take a claimant's reports of his or her limitations into account in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  To the extent the ALJ determines that the claimant's statements are not supported by the medical record,

---

[26] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required the ALJ to make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms, where those statements are not substantiated by objective medical evidence. *See* SSR 96-7p (S.S.A. July 2, 1996).  The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p (S.S.A. Mar. 28, 2016).  Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id.*  Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p *with* SSR 16-3p.  As the ALJ's decision in this matter was issued after the new regulation went into effect, this Court will review the ALJ's evaluation of Plaintiff's statements regarding the intensity of her symptoms under the later regulation, SSR 16-3p.

however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms.  SSR 16-3p.  The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); *id.* §§ 416.929(c)(3)(i)-(vii).

## II.    THE ALJ'S DECISION

On May 8, 2019, ALJ Walters issued his decision, finding that Plaintiff was not under a disability for purposes of the Act and did not qualify for SSDI and SSI benefits.  (R. at 18-26.) In rendering this decision, the ALJ applied the required five-step sequential evaluation.  (*See id.*)

### A.    Steps One Through Three of the Sequential Evaluation

At Step One, the ALJ determined that Plaintiff met the "insured status" requirements of the Act (and would continue to do so, up to December 31, 2022), and that she had not engaged in substantial gainful activity since February 22, 2018, the onset date of her alleged disability.  (*Id.* at 20.)

At Step Two, the ALJ found that Plaintiff had the severe impairment of major depressive disorder, along with the non-severe impairment of vertigo.  (*Id.* (citing 20 C.F.R. §§ 404.1520(c),

416.920(c)).)  With respect to the latter impairment, the ALJ stated that, while Plaintiff had been

"diagnosed with and treated for vertigo, there [was] no evidence to support a finding that it

cause[d] any significant degree of functional limitation."  (*Id.*)  Rather, according to the ALJ, the

"treatment notes document[ed] that [Plaintiff's] vertigo [was] 'stable' with medication."  (*Id.*)

Thus, the ALJ determined that, because "there [was] no indication that [Plaintiff's] vertigo

cause[d] any significant degree of function[al] limitation, it [was] not 'severe' as defined" by the

Regulations.  (*Id.* at 20-21.)

At Step Three, after considering Plaintiff's mental impairments and applying the required

"special technique" for assessing such impairments (*see* Discussion, *supra*, at Section I(B)), the

ALJ determined that those impairments did not "meet or medically equal the criteria of a medical

listing."  (*Id.* at 21.)  In making that finding, the ALJ determined that Plaintiff's mental

impairments did not, as required, meet at least two of the four criteria set out in "Paragraph B" of

Listing 12.04 (Depressive, bipolar and related disorders).[27]  (*Id*.)  In particular, the ALJ

determined that Plaintiff's mental impairments resulted in only a "mild" limitation in

understanding, remembering, or applying information; a "moderate" limitation in interacting

with others; a "moderate" limitation in concentrating, persisting, or maintaining pace; and a

"moderate" limitation in adapting or managing herself.  (*Id*.)[28]

---

[27] Listing 12.04 (Depressive, bipolar and related disorders) provides that a mental impairment may meet the severity of the Listing if the impairment, in addition to being characterized as a condition specifically listed in Paragraph A, "resulted in at least two of the following:  (1) [m]arked restriction of activities of daily living; or (2) [m]arked difficulties in maintaining social functioning; or (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) [r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[28] This Court notes that, although the ALJ did not expressly state this, it appears that he also determined that Plaintiff's mental impairments did not meet the requirements of "Paragraph C" of the Listing.  Listing 12.04 provides that, in the alternative to meeting the requirements of Paragraph B, a mental impairment may meet the severity of such Listing if the impairment,

B.        **The ALJ's Assessment of Plaintiff's RFC**

The ALJ determined that Plaintiff had the RFC to perform medium work (*see* 20 C.F.R.

§§ 404.1567(c), 416.967(c)), but with the following non-exertional limitations:  Plaintiff could

only understand, retain, and follow simple instructions; and could only sustain sufficient

attention to perform simple, repetitive tasks and a routine with no strict production pace or

assembly line quotas.  (R. at 22.)  Further, the ALJ determined that Plaintiff could only

occasionally interact with coworkers, supervisors, and the public, although, at the same time, she

had sufficient capability to respond appropriately to usual work situations and to deal with

changes in a routine work setting.  (*Id.*)

In making this RFC determination, the ALJ found, as a general matter, that Plaintiff had

medically determinable impairments that "could reasonably be expected to cause the alleged

symptoms," but that her "statements concerning the intensity, persistence[,] and limiting effects

of these symptoms" were "not entirely consistent with the medical evidence and other evidence

in the [R]ecord" and, ultimately, with the RFC assessment the ALJ had developed based on that

evidence.  (*Id.*)

More specifically, the ALJ explained his reasoning as follows.  With respect to the

clinical records that were before him, he stated that:

> the weight of the evidence, including mental status examinations
> conducted during the period at issue, provide[d] no support [for] a
> finding that [Plaintiff] ha[d] marked limitations in any . . . areas of

in addition to being characterized as a condition specifically listed in Paragraph A, had a
"medically documented history of a chronic affective disorder of at least [two] years' duration"
which included "(1) [r]epeated episodes of decompensation, each of extended duration; or
(2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal
increase in mental demands or change in the environment would be predicted to cause the
individual to decompensate; or (3) [c]urrent history of [one] or more years' inability to function
outside a highly supportive living arrangement, with an indication of continued need for such an
arrangement."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

> functioning.  On the contrary, upon mental status examinations,
> [Plaintiff] ha[d] consistently exhibited essentially normal findings,
> including:  'full' affect; 'normal' speech; 'logical' and 'goal
> directed' thought process and content with no evidence [of]
> hallucinations or delusions; no psychomotor abnormality; and
> 'fair' insight and judgment.

(*Id.* at 23.)  Also in reference to the objective medical evidence, the ALJ noted that Plaintiff's

"psychiatric impairment ha[d] been described as only 'moderate' in severity."  (*Id.*)

Turning then to the medical opinion evidence, the ALJ first considered the July 2018

report of the consulting psychologist, Dr. Villani.  According to the ALJ, that report "reveal[ed]"

that Plaintiff had only mild limitations in understanding, remembering, and applying simple and

complex directions or instructions; mild limitations using reason and judgment to make work-

related decisions; and mild limitations in sustaining and performing a task at a consistent pace,

regulating emotions, controlling behavior, and maintaining well-being.  (*Id.*)  The ALJ found

"Dr. Villani's opinion [to be] persuasive," as, in the ALJ's view, "it [was] supported by the

treatment evidence of record, including the [ALJ's] cited treatment notes, which document[ed]

that [Plaintiff] ha[d] exhibited normal findings upon mental status examinations."  (*Id.*)  The ALJ

also wrote that Dr. Villani's opinion was "persuasive" because "it [was] consistent with the

pattern of medical evidence in the record, including the [] treatment notes" that the ALJ had

cited; the ALJ wrote that those treatment notes "establishe[d] that [Plaintiff] ha[d] been able to

perform the mental demands of work at all times relevant to this decision."  (*Id.*)

In contrast, the ALJ concluded that the opinion of Plaintiff's treating psychiatrist,

Dr. Grullon (who, as set out above, had found Plaintiff to have multiple "extreme" and "marked"

functional limitations) was "unpersuasive" because, in the ALJ's view, that opinion was

"unsupported by and inconsistent with the evidence of record, including the [ALJ's] cited

findings upon mental status examinations and Dr. Villani's evaluation, which establish[ed] that

[Plaintiff] ha[d] no such limitations to such extent." (*Id.*)  As "[f]urther examples" of evidence purportedly supporting the ALJ's discounting of Dr. Grullon's opinion, the ALJ cited to the following medical evidence that pre-dated the periods under review:

- Dr. Grullon's examination of Plaintiff on May 15, 2017, at which time Dr. Grullon observed that, while Plaintiff was anxious, had trouble sleeping, and had low self-esteem, she also had good eye contact; normal speech and language; normal psychomotor activity; a labile affect, no suicidal or homicidal ideation; a spontaneous, logical, and goal-directed thought process; no internal preoccupation; fair insight, judgment, and impulse control; a full orientation; and fair memory.

- Dr. Grullon's examination of Plaintiff on June 12, 2017, at which time Plaintiff stated that she was "feeling well with [her] medication."

- Plaintiff's statement to MDTC staff on August 15, 2017 that she was "feeling much better," her "self-esteem [was] improving," and she was feeling motivated.

- Dr. Grullon's examination of Plaintiff on December 19, 2017, during which Plaintiff reported that she was "sleeping better," and feeling "less anxious and depressed since [she had taken] medication."

(*Id.* at 24.)

In addition, the ALJ pointed to the following medical evidence from the relevant periods:

- Results from examinations of Plaintiff at MDTC on April 16, 2018 and May 16, 2018, which, according to the ALJ, were both "unremarkable/within normal limits."  The ALJ noted that, on April 16, Plaintiff reported "feeling much better" after her hospitalization, and, on May 16, she stated that she felt "positive" and that her mood was "improving."

- Dr. Grullon's May 30, 2018 examination of Plaintiff, at which time Plaintiff's speech, language, and psychomotor activity were all assessed as within "normal" limits.  At that time, Plaintiff reported that her "mood [was] positive and improving."

- Dr. Grullon's February 16, 2019 "emergency" session with Plaintiff, at which time Plaintiff exhibited limited eye contact, "but

> her speech and language were within normal limits," as was her
> psychomotor activity.  Plaintiff had reported that she felt "very
> depressed and anxious" and that she was not sleeping well, but her
> affect was assessed as full; she had no suicidal or homicidal
> ideation; her thought process was spontaneous, logical, and goal-
> directed; she denied all hallucinations or delusions; she did not
> appear internally preoccupied; she was fully oriented; and her
> insight, judgment, and impulse control were considered "fair."

(*Id.*)  Then, in a generalized review of all of the mental status evaluations conducted between

May 30, 2018 through February 2019, the ALJ concluded that, throughout that time, Plaintiff had

"continued to be WNL [*i.e.*, within normal limits]/unremarkable."  (*Id.*)

Lastly, as with his assessment of Dr. Villani's opinion, the ALJ found the opinion of

Dr. Haus (the SSA non-consultative examiner) to be "persuasive" because it was, in the ALJ's

view, "supported by the evidence of record, including the [] treatment notes [the ALJ had cited],

which document[ed] that [Plaintiff] ha[d] exhibited normal findings upon mental status

examinations."  (*Id.*)  The ALJ also observed that Dr. Haus's opinion was "consistent with

Dr. Villani's opinion, which," in the ALJ's view, "establish[ed] that [Plaintiff's] impairment

[was] not disabling."  (*Id.*)

The ALJ did not assess the medical opinion of Dr. Revan, the other consultative examiner

in this case.

## C.    Steps Four and Five of the Sequential Evaluation

At Step Four, the ALJ found Plaintiff was unable to perform any of her past relevant

work.  (*Id.*)

At Step Five, the ALJ found that Plaintiff was able to perform work existing in the

national economy during the relevant period.  (*Id.* at 25.)  In making this determination, the ALJ

considered Plaintiff's age, education, and RFC, noting specifically that Plaintiff was a younger

individual,[29] that she was not able to communicate in English (and, thus, was considered "in the same way as an individual who is illiterate in English"), and that transferability of job skills was "not material to the determination because using the Medical-Vocational Rules as a framework support[ed] a finding that [Plaintiff was] 'not disabled,' whether or not [she] ha[d] transferable job skills." (*Id.*)  The ALJ also relied on the testimony of the VE, who had testified that an individual of Plaintiff's age, education, work experience, and RFC (as determined by the ALJ) would be able to perform various medium, unskilled jobs existing in the national economy with a SVP level of 2.  (*Id.*)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined under the Act, from February 22, 2018 (the alleged onset date of her disability) through May 8, 2019 (the date of the decision).  (*Id.* at 26.)

## III.   **REVIEW OF THE ALJ'S DECISION**

As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's disability claims, the initial question before this Court is whether, in proceeding under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of Plaintiff's claims.  If the ALJ did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

Upon review, the Court finds that the ALJ did commit certain errors of law that might have affected the outcome of Plaintiff's benefits claims.

First, although, as noted above (*see* Discussion, *supra*, at Section I(C)), the treating physician rule does not apply to Plaintiff's claims, given the date when her applications for

---

[29] As set out above, Plaintiff was 42 years old at the alleged disability onset date, making her a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c), which defines such a person as being under 50 years of age.  (*Id.*)  Under those regulations, the Commissioner considers that the ability of those who are younger than 50 years to adjust to other work is not seriously limited. (*See id.*)

benefits were filed, the ALJ nevertheless failed to assess the opinion evidence properly, even under current standards. More specifically, by cherry-picking from the medical record the particular evidence of Plaintiff's mental health history that aligned with the ALJ's view of the flaws in Dr. Grullon's opinion, and by mischaracterizing other evidence so as to discredit that opinion further, the ALJ failed to engage in a proper analysis or articulation of the "supportability" and "consistency" factors that should have been central to his assessment of that treating-source opinion.

Second, the Court finds that the ALJ's decision, including his RFC determination, is not supported by substantial evidence because it fails to account for the objective medical evidence in the Record, as well as Plaintiff's subjective complaints, regarding the symptoms and functional limitations that she experienced as a result of her diagnosed conditions of vertigo, GAD, and PTSD.

As these errors cannot be said to have been harmless, they warrant remand for further administrative proceedings.[30]

### A.   The ALJ's Failure To Comply With the Requirements of the New SSA Regulations, in Evaluating the Medical Opinion Evidence

As set out above, the new SSA regulations applicable to Plaintiff's claims for benefits required the ALJ to consider a number of factors in connection with evaluating the medical opinion evidence of record – most importantly, the "supportability" and "consistency" of each

---

[30] This Court does not agree with Plaintiff's argument that Dr. Villani's consultative examination did not support her own opinion. (*See* Pl. Mem., at 25.) On examination, Dr. Villani found that Plaintiff was mildly impaired with respect to her ability to maintain attention and concentration, and in areas involving memory, as, on testing, she displayed difficulties with recall and with serial numbers. (R. at 593.) Plaintiff's conclusory assertion that this assessment of "mild" impairment was "far-fetched" (Pl. Mem., at 25), without more, is insufficient grounds for this Court to question Dr. Villani's opinion in this specific regard.

submitted opinion.  *See* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  As a preliminary

matter, the Court notes that, while Plaintiff cites to the correct regulations in her memorandum of

law, she relies heavily on older cases that invoked the no-longer-applicable "treating physician

rule" (*see* Pl. Mem., at 21-22), as does Defendant (*see generally* Def. Mem.).  Regardless, the

Court has undertaken to review the ALJ's decision in light of current standards.  Under those

standards, the decision cannot be affirmed.

The problem here lies in the ALJ's assertion that Dr. Gullon's opinion was

"unpersuasive" because "it [was] unsupported by and inconsistent with the evidence of record."

(R. at 23.)  To support this assertion, the ALJ cited almost entirely to a limited number of mental

status examinations (many of which pre-dated the relevant periods of review) and to

Dr. Villani's consultative evaluation of Plaintiff.  (*See id*.)  If the Record before this Court were

limited to the evidence cited by the ALJ, then his articulated rationale would be understandable.

As the Record is not so limited, however, the ALJ's evaluation of Dr. Grullon's opinion cannot

stand, as it represents a classic example of cherry-picking.

As Plaintiff notes (*see* Pl. Mem., at 23), Dr. Grullon's opinions regarding Plaintiff's

functional limitations are at least arguably consistent with a significant amount of "objective

medical evidence" in the Record, 20 C.F.R. §§ 404.1502(f), 416.1502(f), provided by various

"medical sources," 20 C.F.R. §§ 404.1502(d), 416.1502(d) – particularly hospital records and

treatment notes from Plaintiff's other mental health providers at MDTC, including Harley and

Hernandez.  For example, there is support in the Record for Dr. Grullon's opinion that Plaintiff

had a "marked loss" (meaning a "substantial loss of ability in the named activity" or an ability to

sustain performance "only up to 1/3 of an [eight]-hour workday") in her ability to remember

locations and work-like procedures (*see, e.g.,* R. at 335, 504-05, 638-43, 729 (records concerning

Plaintiff's poor recollection and inability to concentrate)); a "marked loss" in her ability to

maintain regular attendance and to be punctual (*see, e.g., id.* at 363, 449, 499-500, 519, 525, 531,

665, 709, 712 (records concerning Plaintiff's social withdrawal or isolation, as well as her

sleeping problems)); *id.* at 339-41, 531 (records concerning Plaintiff's despondent mood or risk

of decompensation)); an "extreme" limitation in her ability to maintain social functioning (*see,

e.g., id.* at 339-41, 694-95 (records concerning Plaintiff's inability to regulate her emotions and

her violent thoughts towards herself or others); *id.* at 339-41, 449, 496-97, 534, 540, 548, 566,

608-09, 674-76, 703 (records concerning Plaintiff's anxiety, PTSD, and stress caused by

interacting with others)); and, relatedly, an "extreme" limitation in her ability to deal with stress

(*see, e.g., id.* at 335-36, 351, 355, 363, 502-04, 531 (notes in the record concerning Plaintiff's

suicide attempts and suicidal ideation)).

      Further, it is notable that *none* of the medical records cited by the ALJ in his decision

were generated in the period from February through April of 2018 – the months when Plaintiff

was repeatedly hospitalized – even though a substantial portion of the medical evidence from

that time would appear to support Dr. Grullon's assessments.  By turning a blind eye to this large

segment of the medical evidence, the ALJ was not in a position, under the regulations, to analyze

fully the supportability and consistency of the medical opinion of Dr. Grullon – Plaintiff's long-

standing mental-health treater.  *See, e.g., Prietro v. Comm'r of Soc. Sec.*, No. 20cv3941 (RWL),

2021 WL 3475625, at *14 (S.D.N.Y. Aug. 2, 2021) (under new regulations, holding the ALJ

failed to make a proper analysis of the supportability and consistency factors, where, in part, the

ALJ's "selective and unexplained weighting of the medical opinions . . . violate[d] the principle

against cherry-picking").

Moreover, in discrediting Dr. Grullon's opinion that Plaintiff had a number of "extreme" and "marked" limitations, the ALJ wrote that "Plaintiff's psychiatric impairment ha[d] been described [as] only 'moderate' in severity." (R. at 23.) This statement is a mischaracterization, or, at best, an oversimplification, of the clinical evidence. On March 23, 2018, Plaintiff was assessed at Jacobi Hospital as having "severe[]" depression, and a GAF score of 30, which meant she was displaying "[b]ehavior considerably influenced by delusions or hallucinations OR [a] *serious* impairment in communication or judgment (*e.g.,* sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR [an] inability to function in *almost all areas*." DSM IV, at 34 (emphases added). Two months later, on May 31, 2018, Plaintiff was seen by Dr. Joseph Williams, another doctor at MDTC, at which time she was assessed a PHQ-9 score of 24, indicating that she was experiencing *severe* depressive symptoms. (R. at 542.) The ALJ's failure to acknowledge these medical findings in his assessment of the "severity" of Plaintiff's psychiatric condition again cuts against his analysis and articulation of the supportability and consistency of Dr. Grullon's opinion.

Ultimately, as district courts (in and outside of this Circuit) have noted, "[t]hough the regulations have changed, the governing statute still requires an ALJ to base the decision on 'all the evidence available in the record.'" *Thompson v. Comm'r of Soc. Sec.*, No. 2:20-cv-3-KJN, 2021 WL 1907488, at *6 (E.D. Cal. May 12, 2021) (quoting 42 U.S.C. § 423(d)(5)(B)); *see Vellone*, 2021 WL 319355, at *9. While an ALJ is not required to provide an explicit analysis of every piece of conflicting evidence in the record, *see Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) ("[W]e are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony"), an ALJ cannot simply "'pick and choose' evidence in the record that supports his conclusions," *Andrew G.*, 2020 WL 5848776, at *9 (citation omitted) (applying new

regulations), nor can he rely upon mischaracterized evidence to justify his rejection of a treater's opinion or substantiate his own lay opinions, *see Plaza v. Comm'r of Soc. Sec.*, No. 19cv3853 (DF), 2020 WL 6135716, at *21 (S.D.N.Y. Oct. 16, 2020) ("[T]he ALJ impermissibly substituted his own lay opinion for the opinion of a medical doctor, which was error").  Indeed, it is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and treat them as a basis for concluding [that] a [claimaint] is capable of working." *Rivera v. Comm'r of Soc. Sec. Admin.*, No. 19cv4630 (LJL) (BCM), 2020 WL 8167136, at *16 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom.*, 2021 WL 134956 (Jan. 14, 2021) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019)); *see also Thompson*, 2021 WL 1907488, at *6 (noting that, "if an ALJ were allowed to pick through the record for facts that align with an 'unpersuasive' finding, and ignore facts that otherwise call that finding into question, a reviewing court would be required to ignore large portions of the record simply because the ALJ also avoided discussing such evidence").

　　As of this date, multiple district courts that have reviewed ALJ decisions under the new SSA regulations have remanded cases where the evidence supporting or consistent with a rejected medical opinion was ignored or mischaracterized.  *See, e.g., Vellone*, 2021 WL 319354, at *9-10 (finding the ALJ's RFC determination was "not supported by substantial evidence" where the ALJ "cherry-picked treatment notes that supported his RFC determination [at times indicating normal gait and spine] while ignoring equally, if not more significant evidence [indicating abnormal gait and worsening lower back pain]"); *see also Pearce v. Saul*, No. 0:20-1623-PJG, 2020 WL 7585915, at *4-6 (D.S.C. Dec. 22, 2020) (holding that, where the ALJ cherry-picked evidence to discount the treating physician's limiting opinion – even though that opinion was supported by multiple medical records – the ALJ had "failed to explain how the

evidence support[ed] her conclusion," such that "meaningful review [wa]s frustrated"); *see generally see also Dany Z.*, 2021 WL 1232641, at *12 ("The new regulations cannot be read as a blank check giving ALJs permission to rely solely on agency consultants while dismissing treating physicians in a conclusory manner.").

In accordance with this precedent, the Court finds that the ALJ's inadequate review and consideration of the medical evidence in the Record led him to analyze the supportability and consistency of Dr. Grullon's opinion improperly, and to articulate inadequately his rationale for rejecting that opinion.  As, under these circumstances, the Court cannot conclude that the ALJ's determination regarding Plaintiff's disability status was justified, remand is required.  Upon remand, the ALJ is directed to give full and fair consideration to *all* of the relevant clinical evidence in the Record – including the evidence (such as that from the period of Plaintiff's hospitalizations) that may support Dr. Grullon's opinion, as well as the evidence that may not support it – and, after such consideration, to reevaluate the persuasiveness of that opinion, utilizing the appropriate factors.  *See* 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

**B.      In Formulating Plaintiff's RFC, the ALJ
Failed To Account For Any Limitations Resulting
From Plaintiff's Diagnosed Vertigo, GAD, and PTSD.**

The Court also finds that the ALJ failed to engage in a proper consideration and evaluation of both the objective medical evidence and Plaintiff's subjective complaints concerning the symptoms and functional limitations she experienced as a result of her diagnosed conditions of vertigo, GAD, and PTSD.

Starting with Plaintiff's vertigo, the ALJ wrote that this was a "non-severe impairment" because, in the ALJ's view, "treatment notes document[ed] that [Plaintiff's] vertigo [was] 'stable' with medication."  (R. at 20.)  It appears, however that the ALJ relied on exactly one

treatment note from May 17, 2018 for this *entire* assessment.  (*Id.* at 384-85.)  In view of the

Record as a whole, the ALJ's conclusion about the stability of Plaintiff's vertigo diagnosis

constituted both (1) a mischaracterization of the clinical evidence, and (2) a legally erroneous

failure to account for Plaintiff's subjective complaints about her vertigo-related limitations.

Plaintiff's vertigo symptoms were documented in the medical records as early as

December 2017.  (*Id.* at 311 (Lincoln Medical note that Plaintiff was experiencing dizziness,

followed by vertigo episodes that lasted "up to seven minutes at a time").)  Later, on May 17,

2018, Plaintiff visited Bronx-Lebanon because she reported experiencing dizziness, nausea, and

prolonged periods of vomiting.  (*Id.* at 384.)  In an initial evaluation, she was assessed with

having "peripheral vertigo," and then, as the ALJ pointed out in his decision, during a "re-check"

three hours later, it was recorded that Plaintiff appeared "stable" and had been "improving with

treatment."  (*Id.* at 385.)  Yet, only five days later, on May 22, Plaintiff complained to

Dr. Grullon that she was still experiencing vertigo (*id.* at 548), and then again, on June 5,

Hernandez at MDTC recorded that Plaintiff was reportedly still experiencing ringing in her ears

(*id.* at 590).  Less than three weeks after that, on June 21, Harley indicated that Plaintiff's vertigo

symptoms had been serious enough to prevent her from attending a recovery group session.  (*Id.*

at 583.)  Further, on June 29, Plaintiff reported to Harley that her vertigo and dizziness had made

it difficult for her to ambulate.  (*Id.* at 585.)  It seems apparent that Plaintiff's vertigo-related

symptoms then continued in the months thereafter, given that, on November 13, 2018, Plaintiff

was treated at Bronx Lebanon for vertigo and dizziness (*id.* at 687); on December 18, she

reported to Harley that she had felt dizzy "for about a week" (*id.* at 700); and, in January 2019,

she made another report of dizziness (*id.* at 712).  The ALJ did not try to reconcile any of this

evidence (particularly the treatment records post-dating May 17, 2018) with his conclusory

assertion, based on a single medical note, that Plaintiff's vertigo was a non-severe, "stable" impairment.

Moreover, as at least one district court in this Circuit has observed, "'a person can have a condition that is both 'stable' and disabling at the same time.'" *Taylor v. Berryhill*, No. 15-CV-403A, 2017 WL 4570388, at *8 (W.D.N.Y. May 17, 2017) (quoting *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008)), *report and recommendation adopted*, 2017 WL 4541014 (Oct. 11, 2017). In addition to relying solely on one medical treatment note from May 2018 to suggest that, throughout the periods under review, Plaintiff's vertigo was "stable" with medication, the ALJ failed to address the separate question about what such stability meant in the context of Plaintiff's alleged disability under the Act.

Turning to the subjective complaints about her vertigo that Plaintiff raised before the SSA, she testified at the Hearing, in March 2019, that her vertigo symptoms included vomiting, dizziness, and loss of balance. (*See* R. at 46-48.) She reported falling frequently, hearing things in her ears, becoming dizzy about three times per week, being unable to handle heights, and being unable either to ride the train or to sit on the bus without experiencing dizziness. (*See id*.) Further, at her consultative examination with Dr. Villani on July 21, 2018, Plaintiff reported that her vertigo made her feel dizzy, have difficulty in close spaces, and fear falling. (*Id.* at 594 (Dr. Villani noting that Plaintiff's fear of "falling" reportedly caused her to leave "a lot of things unattended to").) Plaintiff reported many of these same symptoms to the other consultative examiner, Dr. Revan, who opined in July 2018 that Plaintiff had a "[l]imitation with activities of daily living due to vertigo" (*id.* at 589) – an opinion the ALJ did not address, at all, in his decision.

The ALJ was not at liberty to ignore or mischaracterize both the bulk of the clinical evidence and Plaintiff's subjective complaints regarding the effects of her diagnosed vertigo, yet that is effectively what he did.  Notably, had the ALJ fully considered the totality of this evidence, he may very well have found that Plaintiff's vertigo constituted a "severe impairment." Yet, even assuming that it was proper for him to have labeled Plaintiff's vertigo diagnosis as "non-severe," he was still obligated to take Plaintiff's reports of vertigo-related symptoms and limitations "into account" in assessing her RFC.  *Genier*, 606 F.3d at 49.  He was also obligated to consider the combined effect of Plaintiff's vertigo and her major depressive disorder.  *Dixon*, 54 F.3d at 1031 (stating that "the combined effect of a claimant's impairments must be considered in determining disability").  In crafting Plaintiff's RFC, the ALJ entirely neglected to account for the well-documented limitations reported by Plaintiff that she claimed were caused by her vertigo, including her frequent dizzy spells and her difficulties in taking public transportation, getting out of bed, performing routine at-home tasks, and maintaining her balance.  Overall, the ALJ's decision reflects that he did not give the necessary consideration to Plaintiff's complaints regarding her vertigo, which, in turn, may have impacted the ALJ's assessment of Plaintiff's functional limitations.

In the same vein, the ALJ also erred in not considering whether Plaintiff had limitations resulting from her conditions of GAD and PTSD.  (R. at 624-27.)  While the ALJ addressed the fact that Plaintiff had been diagnosed with major depressive disorder (*see id*. at 20-21), he never even mentioned that Plaintiff had also been diagnosed with these other psychiatric conditions. Not only were the additional diagnoses of GAD and PTSD well documented throughout the medical record (*see id.* at 511-16, 570-73, 592-95, 620-27), but it was recorded, on multiple occasions, that Plaintiff suffered from symptoms associated with these conditions, including

anxiety, flashbacks, and nightmares (*see id.* at 511-16, 537, 540, 548-49, 566-69, 570-73, 579-84, 608-11, 620-23, 674-79, 703-06).  Despite this clinical evidence, as well as Plaintiff's subjective reports that she suffered symptoms of both GAD and her PTSD (*see, e.g., id.* at 235 (noting in Plaintiff's Function Report that she "fear[ed]" leaving the house and was "trigger[ed]" by being in close spaces or hearing people argue)), the ALJ failed to consider – at least explicitly – whether either or both of these conditions gave rise to functional limitations that should have been factored into Plaintiff's RFC.

In short, the ALJ's decision suggests that he did not thoroughly consider the evidence of at least three, potentially significant and plainly documented impairments that may have impacted Plaintiff's functional abilities.  Accordingly, on this basis, as well as for the reasons discussed above, the ALJ's decision must be reversed and remanded.  Upon remand, the ALJ should reassess Plaintiff's RFC, taking into account both the objective medical evidence and Plaintiff's subjective complaints regarding any limiting effects of her vertigo, GAD, and PTSD.  In addressing Plaintiff's subjective complaints, the ALJ should apply the multi-factor test described above (*see* Discussion, *supra*, at Section I(D)), and, to the extent the ALJ finds Plaintiff's subjective complaints to be inconsistent with the medical evidence, he should set forth the reasons for his findings.  Finally, if the ALJ modifies his initial RFC determination with any additional non-exertional limitations, then he should recall the VE for further testimony, in aid of determining whether Plaintiff's reassessed RFC would have precluded her from being employed during the relevant periods.

### C.    The ALJ's Errors Were Not Harmless.

As Defendant does not concede any possible error by the ALJ, Defendant makes no "harmless error" argument.  Nonetheless, the Court notes that the ALJ's legal errors, as

described above, could not be characterized as harmless.  Dr. Grullon opined that Plaintiff had extreme or marked limitations in, *inter alia*, using public transportation, completing a normal workday or work week without interruptions from psychologically based symptoms, remembering locations and work-like procedures, and maintaining regular attendance and being punctual.  (R. at 626.)  In addition, Dr. Grullon opined that Plaintiff would likely be absent from work more than three times per month.  (*Id.* at 625.)  Plaintiff, in her Function Report and at the Hearing, reported that she experienced dizziness at least three times a week, and that her vertigo made it challenging for her to get out of bed, put on clothes or do her hair, leave the house, or take public transportation.  (*Id.* at 38, 233-36.)  She also stated that her anxiety caused her to have trouble sleeping and she sometimes "fear[ed]" leaving the house.  (*Id.* at 42-43, 235.)  This evidence all suggests that, due to either her mental health status or her vertigo diagnosis (or a combination of those impairments) Plaintiff was potentially unable to go to work on a regular and reliable basis.

It is of particular note that the VE testified at the Hearing that, if Plaintiff were absent from work more than once a month, then, based on the RFC described by the ALJ, there would be no job in the national economy for her to perform.  (*Id.* at 32.)  Faced with this testimony, had the ALJ accorded even a bit more weight to Dr. Grullon's opinion, the ALJ could have found that Plaintiff was unable to meet the attendance requirements for the jobs identified by the VE, such that she should have been found disabled under the Act.  *See Gallagher v. Astrue*, No. 10cv8338 (LTS) (AJP), 2012 WL 987505, at *22 (S.D.N.Y. Mar. 22, 2012) (substantial evidence did not support finding of no disability, when ALJ failed to address VE testimony that there would be no jobs for someone who missed three days per month), *report and recommendation adopted*, 2012 WL 1339357 (Apr. 17, 2012).  Likewise, had the ALJ

adequately considered Plaintiff's complaints regarding her vertigo, or her GAD and PTSD, the

ALJ may have found that Plaintiff's overall condition was more complex – and her resulting

limitations more substantial – than what was reflected in the ALJ's RFC determination.  This,

too, could have altered the ultimate disability determination.  Thus, the ALJ's errors cannot be

considered harmless, and remand is required.

## CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings

(Dkt. 15) is granted; Defendant's cross-motion for judgment on the pleadings (Dkt. 17) is denied;

and this case is hereby remanded to the SSA pursuant to sentence four of Section 205(g) of the

Act, 42 U.S.C. § 405(g).

Upon remand, the ALJ is directed:

> (1)     to reevaluate Dr. Grullon's medical opinion, in light of the
> totality of the evidence in the Record, and in accordance
> with the factors set out in the new regulations, 20 C.F.R.
> §§ 404.1520c(a)-(c) and 416.920c(a)-(c);

> (2)     to reevaluate Plaintiff's subjective complaints regarding her
> symptoms of vertigo, GAD, and PTSD, in light of the
> medical record and in accordance with the factors set out in
> 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), and to set out his
> reasoning as to the extent of any functional limitations
> resulting from such symptoms; and

> (3)     upon reevaluating both Dr. Grullon's opinion and
> Plaintiff's subjective complaints, to reassess Plaintiff's
> RFC, and, if necessary, to recall the VE for additional
> testimony to aid in a determination as to whether, based on

the reassessed RFC, Plaintiff should be considered disabled under the Act.

Dated:  New York, New York
        September 24, 2021

                                        SO ORDERED

                                        _____
                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

All counsel (via ECF)